IN RE JERMAINE S. ET AL.*
(AC 25065)
(AC 25066)

Bishop, West and DiPentima, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in these appeals are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 14, 2004—officially released January 11, 2005

*Thomas F. Mitola,* with whom, on the brief, was *David B. Rozwaski,* for the appellant (respondent mother).

*Raymond J. Rigat,* for the appellant (respondent father).

*Paula D. Sullivan,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

BISHOP, J. In these consolidated appeals,[1] the respondent mother appeals in AC 25065 from the judgments of the trial court terminating her parental rights with respect to her two minor children, Jermale and Jermaine, and the respondent father appeals in AC 25066 from the judgment terminating his parental rights with respect to his son, Jermaine.[2] On appeal, the

---

[1] The trial court consolidated the petitions to terminate the respondents' parental rights with respect to their respective children and jointly adjudicated both cases. In the interest of efficiency, we will review this matter as a joint appeal.

[2] The identity of Jermale's biological father has not been ascertained. Paternity tests indicated that Jermaine's father is not the father of Jermale. The court thereafter terminated the parental rights of John Doe as to Jermale. No appeal has been filed on behalf of John Doe.

respondent mother claims that the court improperly
determined that (1) she neglected Jermaine, (2) she
failed to achieve a sufficient degree of personal rehabili-
tation pursuant to General Statutes § 17a-112 (j) (3) (B)
and (3) it was in the best interests of the children to
terminate her parental rights.[3] The respondent father
claims that the court improperly determined that (1)
the department of children and families (department)
made reasonable efforts at reunification and that he
was unwilling or unable to benefit from those efforts,
(2) he abandoned his son and (3) termination of his
parental rights was in the best interest of the child.[4]
We affirm the judgments of the trial court.

[3] On appeal, the respondent mother also claims that the court improperly
concluded that she had no ongoing parent-child relationship with her chil-
dren. We decline to review that claim because the statutory grounds neces-
sary to grant a petition for termination of parental rights are expressed in
the disjunctive, and the court, therefore, needs to find only one ground to
grant a petition to terminate parental rights. *In re Brea B.*, 75 Conn. App.
466, 473, 816 A.2d 707 (2003). "Thus, we may affirm the court's decision if we
find that it properly concluded that any one of the statutory circumstances
existed." Id. Because we conclude that there was clear and convincing
evidence that the respondent mother failed to achieve a sufficient degree
of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B),
we need not address her remaining claim regarding the statutory grounds
for the termination of her parental rights.

[4] On appeal, the respondent father also claims that the court improperly
concluded that he (1) had failed to achieve a sufficient degree of personal
rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) and (2) had
no parent-child relationship with his child pursuant to § 17a-112 (j) (3) (D).
"[W]e may affirm the court's decision if we find that it properly concluded
that any one of the statutory circumstances existed." *In re Brea B.*, 75 Conn.
App. 466, 473, 816 A.2d 707 (2003).

Because we conclude that there was clear and convincing evidence that
the respondent father abandoned Jermaine, we need not address the respon-
dent father's remaining claim. In addition, the respondent father claims that
the clearly erroneous standard of review on appeal is not sufficient for
review of termination of parental rights matters under the due process clause
of the fourteenth amendment to the United States constitution. Instead, the
respondent father claims that the proper standard of review on appeal in
a termination of parental rights case is de novo. That issue was not raised
before the trial court and was not raised, on appeal, pursuant to the plain
error doctrine; Practice Book § 60-5; or under *State* v. *Golding*, 213 Conn.
233, 239–40, 567 A.2d 823 (1989). "As this court has previously noted, it is
not appropriate to engage in a level of review that is not requested." *State*

The following facts and procedural history are relevant to our discussion of the issues on appeal. On December 15, 2000, the respondent mother gave birth to Jermale. Two days later, hospital personnel contacted the department to report that Jermale had tested positive for phencyclidine (PCP). The respondent mother also admitted that she had used drugs during her pregnancy with Jermale. On February 21, 2001, she was placed on three years' probation for a conviction in 2000 for the sale of drugs. The following day, February 22, 2001, the respondent mother began outpatient treatment for substance abuse at the central treatment unit of the APT Foundation in New Haven, but the unit discharged her from the program on March 29, 2001, for noncompliance and continued drug use. On July 6, 2001, the petitioner, the commissioner of children and families, filed a neglect petition on behalf of Jermale, and the court granted an order of temporary custody on August 10, 2001.

On August 29, 2001, the court ordered the respondent mother to follow specific steps to address her substance abuse and chronic mental health issues. The respondent mother, however, failed to comply with those court-ordered specific steps. From thereon, she continued on a path of chronic substance abuse, denial and failure to seek and to accept treatment. On numerous occasions, the commissioner referred her to agencies providing mental health services and substance abuse treatment. The respondent mother, however, failed to participate fully in any services and, when she did take advantage of certain opportunities, was discharged for being noncompliant. She repeatedly denied even having a substance abuse problem, even though she never

v. *Hermann*, 38 Conn. App. 56, 65, 658 A.2d 148, cert. denied, 235 Conn. 903, 665 A.2d 904 (1995). Accordingly, we decline to review that claim. See *In re Hector L.*, 53 Conn. App. 359, 369, 730 A.2d 106 (1999). We note, nevertheless, that our standard of review is well settled law from which we see no reason to deviate.

tested negative for controlled substances, and tested positive on several occasions for PCP and cocaine. Additionally, the respondent mother failed to visit Jermale on a consistent basis. She failed to visit him for fourteen out of thirty-seven prearranged visits from August 10, 2001, to May 29, 2002. During some of those visits, the respondent mother appeared to be under the influence of substances and inappropriately interacted with Jermale. In June, 2002, the department discontinued visitation due to the respondent mother's instability, hostility and aggressiveness toward department personnel.

The respondent mother gave birth to Jermaine on January 22, 2002. At birth, Jermaine weighed four pounds, four ounces, tested positive for PCP and suffered from symptoms of withdrawal. The respondent mother admitted that she had used PCP shortly before giving birth and throughout her pregnancy with Jermaine. On January 24, 2002, the commissioner placed Jermaine in her custody on a special ninety-six hour hold; see General Statutes § 17a-101g; and on January 25, 2002, the court granted an order of temporary custody on behalf of Jermaine. Consequently, the commissioner placed Jermaine in foster care when he was released from the hospital.

The respondent father of Jermaine has been convicted of and imprisoned for various narcotics, larceny and assault charges, has a history of substance abuse and was incarcerated at the time of Jermaine's birth until June, 2003. He first visited with Jermaine in conjunction with an interactional evaluation with Julia Ramos Grenier, a psychologist who served as an expert in the case, on November 21, 2002. Prior to the evaluation, the respondent father had not requested any visits

with Jermaine. During the respondent father's period of incarceration, the commissioner maintained regular contact with Jermaine's paternal grandmother, who acted as a liaison between the respondent father and the commissioner. While in prison, the respondent father participated in certain services offered by the department of correction. He completed prevention education for the human immunodeficiency virus and participated in a class entitled "Thinking for a Change," as well as a parenting skills class. The respondent father, however, failed to write to his son, to send him gifts or to inquire about his welfare, aside from sending one card and a bookmark that he had made in a prison program.

In addition to his visit with Jermaine during the first interactional evaluation, the respondent father visited his son on only two occasions. On January 30, 2002, the respondent father visited with his son at his place of incarceration. The respondent father stated that he had not asked for the visit, as he did not want his son to come to the correctional facility during cold weather months. After approximately fifteen minutes, the respondent father terminated the January visit, claiming that he ended the visit early because his son was sick and that the facility was physically too cold for his son. The commissioner's records, however, show that Jermaine was not ill during that time period. Once the respondent father was released from incarceration in June, 2003, the commissioner offered visitation to him as well as certain services. Nevertheless, he refused the referrals, and when he visited his son at the department's offices, he cut the visit short, telling the department staff that he had to rush to an appointment for parole purposes. Shortly thereafter, a department staff member found the respondent father in the lobby speaking with others, in no apparent hurry to get to the claimed appointment. The respondent father also

obtained a painting job for which he was paid "under the table," but provided no financial support for his son. He did not present the court with a solid plan for raising his son, suggesting, rather, that his mother could raise his son. The grandmother, however, has been ambivalent regarding her willingness to be a parental resource to Jermaine.

On July 26, 2002, the commissioner filed a petition to terminate the parental rights of the respondent mother as to Jermale. Jermale had been adjudicated neglected and was committed to the custody of the commissioner on March 4, 2002. On June 18, 2002, the court found by clear and convincing evidence that continuing efforts at reunifying Jermale and the respondent mother were no longer appropriate. On April 30, 2003, the commissioner filed a petition to terminate the parental rights of the respondents with respect to Jermaine. Jermaine previously had not been adjudicated neglected, and the pending neglect case was consolidated with the termination of parental rights petition. On January 6, 2004, the court terminated the respondent mother's parental rights as to Jermale and Jermaine, and terminated the respondent father's parental rights as to Jermaine. These appeals followed.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a

conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . . A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003). We will review the respondents' claims in turn.

I

We begin with a discussion of the respondent mother's claims. The court terminated her parental rights as to Jermaine and Jermale after it found that (1) pursuant to General Statutes § 46b-120 and on the basis of the preponderance of the evidence, she had neglected Jermaine, (2) by clear and convincing evidence, she had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the lives of her children within the meaning of § 17a-112 (j) (3) (B), and (3) the termination of her parental rights was in the best interests of the children.

A

The respondent mother first claims that there was insufficient evidence to support an adjudication of

neglect as to Jermaine[5] pursuant to § 46b-120 (9).[6] We do not agree.

The following facts are relevant to the disposition of that issue. As to Jermaine, the termination of parental rights proceedings, which took place on August 25, 26 and 28, 2003, involved coterminous petitions for neglect and termination because Jermaine had not previously been adjudicated in the neglect case that was filed on January 25, 2002. Accordingly, the court first considered, pursuant to General Statutes § 46b-120 (9)[7] and on the basis of the preponderance of the evidence, whether Jermaine's parents had neglected him.

The court found that the commissioner had proved the grounds necessary to find Jermaine neglected. Spe-

[5] In her appellate brief, the respondent mother claims that "the trial court erred in its adjudication of neglect in these petitions." We interpret the respondent mother to be referring only to the adjudication of neglect as to Jermaine. In her argument regarding the adjudication of neglect, the respondent mother puts forth facts involving only her relationship with Jermaine and does not mention Jermale. Jermale was adjudicated neglected in a separate proceeding on August 10, 2001. Therefore, we interpret the respondent mother to be challenging the adjudication of neglect only as to Jermaine.

[6] General Statutes § 46b-120 provides in relevant part: "(9) a child or youth may be found 'neglected' who (A) has been abandoned, or (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused . . . ."

[7] "The petition for neglect and the petition to terminate parental rights are separate and distinct petitions. Where a neglect petition is filed, the court first adjudicates whether there is neglect. . . . Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. . . . Disposition in a neglect petition may take one of a number of forms, including . . . the initiation of proceedings to terminate parental rights." (Citations omitted.) *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 261, 471 A.2d 1380 (1984). "The termination of parental rights petition involves its own specific elements." Id., 262. "While a finding of neglect, resulting in non-permanent custody, may be proved by a fair preponderance of the evidence, all of the elements of the termination of parental rights petition must be proved by clear and convincing evidence." Id., 266.

cifically, the court found in relevant part: "Jermaine was born addicted, [his] mother had a lengthy history of the use of illegal substances, including PCP, [his] mother had a lengthy history of mental health issues, [his] mother denied her substance abuse, [his] mother was noncompliant with her mental health treatment, and . . . on the date of the order of temporary custody, the date of the child's birth, and the date the petition was filed, [his] father was in jail and a noncustodial resource."

"When considering a challenge to the sufficiency of the evidence, the function of an appellate court is to review the findings of the trial court, not to retry the case." *In re Alexander T.*, 81 Conn. App. 668, 677, 841 A.2d 274, cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). "[W]e must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . [W]e give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . ." (Citations omitted; internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 322, 796 A.2d 516 (2002).

The respondent mother claims that she did not neglect Jermaine because she never had custody of him, as he was removed from her custody immediately after birth on a ninety-six hour hold; see General Statutes § 17a-101g; and subsequently placed under an order of temporary custody. In support of her claim that there was insufficient evidence to adjudicate Jermaine neglected, the respondent mother also highlights that she went to a hospital for prenatal examinations and

made attempts to visit Jermaine as often as she could until the commissioner prohibited her from visiting him.

From our review of the record, we conclude that the court's findings were supported by the evidence. The court reasonably could have found, on the basis of the preponderance of the evidence, that the respondent mother had neglected Jermaine. At birth, Jermaine was addicted to PCP due to the respondent mother's serious drug habit, and she never seriously committed herself to substance abuse treatment.[8]

Additionally, "[o]ur statutes clearly permit an adjudication of neglect based on a potential for harm or abuse to occur in the future. General Statutes § 17a-101 (a) provides: The public policy of this state is: To protect children whose health and welfare *may* be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of *suspected* child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family. . . . By its terms, § 17a-101 (a) connotes a responsibility on the state's behalf to act before the actual occurrence of injury or neglect has taken place. . . .

---

[8] We note that in *In re Valerie D.*, 223 Conn. 492, 524, 613 A.2d 748 (1992), our Supreme Court held that "[§ 17a-112] does not contemplate a petition for the termination of parental rights based upon prenatal drug use by the mother." Our Supreme Court in that case, however, did not review the issue of whether an adjudication of neglect may be based solely on a mother's prenatal conduct. In this case, we do not reach the issue either, but rather hold that the trial court's conclusion that Jermaine was neglected was not clearly erroneous on the basis of the evidence that Jermaine was born addicted to PCP coupled with the respondent mother's failure to accept the numerous services recommended by the commissioner, her consistent denial of her substance abuse addiction, her inconsistency in visiting with the child and the probability of future harm to the child.

"The department, pursuant to [§ 46b-120], need not wait until a child is actually harmed before intervening to protect that child. . . . This statute clearly contemplates a situation where harm could occur but has not actually occurred. Our statutes clearly and explicitly recognize the state's authority to act before harm occurs to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected." (Emphasis in original; internal quotation marks omitted.) *In re Michael D.*, 58 Conn. App. 119, 123–24, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000). The commissioner took preventive actions in this case. The respondent mother had a serious and long-term history of drug abuse and did nothing to remedy her drug abuse problem. She also suffered from substantial mental health problems for which she continually refused treatment. Our review of the record leads us to conclude that there was at least a potential for neglect to occur in the near future. "An adjudication of neglect may be based on a potential risk of harm and not just actual harm." Id., 124–25. We conclude that the court reasonably adjudicated the child to be neglected. We will not, therefore, disturb that ruling.

B

Having adjudicated Jermaine neglected by a fair preponderance of the evidence, the court then determined that an adjudicatory ground for the termination of parental rights as to both children existed. The respondent mother claims that the court improperly found that she had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time she could assume a responsible position in the lives of her children within the meaning of § 17a-112 (j) (3) (B).[9] We are not persuaded.

[9] General Statutes § 17a-112 (j) provides in relevant part that a trial court may grant a termination petition if it finds by clear and convincing evidence "(3) that . . . (B) the child (i) has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding,

The respondent mother asserts that the evidence presented supports a finding that she had been making regular visits with her children, was being treated for a mental health problem in 2003 and could assume responsibility for the care of her child in the future with appropriate services in place. The commissioner contends that the court's conclusion that the respondent mother had failed to achieve a sufficient degree of rehabilitation within the meaning of § 17a-112 (j) (3) (B) is legally correct and factually supported by the record.

Failure to achieve a sufficient degree of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j) (3). Our Supreme Court has stated that "[p]ersonal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a . . . delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation

or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and *has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .*" (Emphasis added.)

she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citation omitted; internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 398–99, 852 A.2d 643 (2004).

The record supports the court's finding that the commissioner had proved by clear and convincing evidence that the respondent mother had failed to attain a degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, she would be capable of assuming a responsible position with respect to the care of her children. The record reflects that the respondent mother failed to engage in the numerous services recommended by the commissioner and did not comply with the specific steps requested to facilitate the return of the child to her care. The record additionally shows that she had not successfully completed any counseling programs or maintained adequate housing, legal income or employment, and that she continued to be involved with the criminal justice system. The court reasonably could have concluded, as it did, that "there was no evidence that would allow the court to conclude that [the respondent] mother would be able to manage her own life, let alone the life of either child. Based on the [respondent] mother's long-term history of substance use and her long-term history of mental health issues, no rehabilitation is foreseeable within any time period, let alone a reasonable time period." Given the seriousness of her substance abuse and mental health conditions and their effect on her ability to parent Jermaine and Jermale, and her failure to take advantage of programs offered to address those conditions, the court reasonably concluded that the respondent mother could not achieve such a degree of personal rehabilitation as would encourage the belief that within

a reasonable time, she could assume a responsible position in the life of the children.

The respondent mother correctly maintains "that rehabilitation does not require that a parent be able to assume the full responsibility for a child without the use of available support programs such as those recommended by the petitioner." *In re Jennifer W.*, 75 Conn. App. 485, 499, 816 A.2d 697, cert. denied, 263 Conn. 917, 821 A.2d 770 (2003). She argues that she has expressed love and concern for her children and a desire to regain custody of them, and she highlights the fact that she made numerous visits with her children. Above all, she claims that she could assume responsibility for the care of her children in the future with appropriate services in place.

The record plainly and painfully demonstrates that although many efforts were arranged for the respondent mother to address her substance abuse problem, she consistently rejected those efforts. Moreover, because of her inability to admit to herself and to others that she had a substance abuse problem, she was unable to benefit from the department's efforts. Her denial of her substance abuse problem and failure to commit to any drug rehabilitation program thwarted her ability to achieve rehabilitation. The record reveals, too, that the court had ample evidence to support its finding that the respondent mother made very few, if any, personal gains.

We conclude that the court's finding, by clear and convincing evidence, that the respondent mother had failed to achieve a degree of rehabilitation as would encourage the belief that within a reasonable period of time she could assume a responsible position in the children's lives was not clearly erroneous.

C

The respondent mother further claims that the court improperly found, in the dispositional phase of the pro-

ceeding, that it would be in the best interests of the children to terminate her parental rights. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)].[10] On appeal, we will disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous." (Internal quotation marks omitted.) *In re Vanna A.*, 83 Conn. App. 17, 26–27, 847 A.2d 1073 (2004).

[10] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

The following additional facts are relevant to the respondent mother's claim. Jermaine and Jermale live together with the same foster parents in a preadoptive home and are showing signs of progress. The children call their foster parents mom and dad. Jermaine has been in the same foster home for his entire life. The foster parents have expressed a willingness to adopt the children. The court, as required, considered and addressed in writing the seven factors set forth in § 17a-112 (k).

We have noted consistently the importance of permanency in children's lives. See, e.g., *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 646 n.4, 436 A.2d 290 (1980) (removing child from foster home or further delaying permanency would be inconsistent with child's best interest). "Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments." (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 285, 455 A.2d 1313 (1983). In light of our conclusion that it was not clearly erroneous for the court to conclude, by clear and convincing evidence, that the commissioner had shown that the respondent mother failed to reach a degree of rehabilitation sufficient to satisfy the statute, coupled with the need for permanency in the children's lives, we conclude that the court did not improperly conclude that clear and convincing evidence established that it was in Jermale's and Jermaine's best interests to terminate the respondent mother's parental rights.

II

We now turn to the respondent father's claims. The court determined that (1) the department's efforts at reunification were sufficient under § 17a-112 (j), (2) that the respondent father had abandoned Jermaine

and (3) termination of the respondent father's parental rights was in the best interest of his son.

## A

The respondent father claims that the court improperly ruled that the department's efforts at reunification were reasonable by clear and convincing evidence, and that he was unwilling or unable to benefit from those efforts. We disagree.

General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court, upon hearing and notice as provided in sections 45a-716 and 45a-717, may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the [d]epartment of [c]hildren and [f]amilies has made reasonable efforts to . . . reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ." In order to grant a petition for termination of parental rights, § 17-112 (j) "makes clear that the court must make a finding based on clear and convincing evidence that the department made reasonable efforts at reunification or, in the alternative, make a finding that the parent is unwilling or unable to benefit from reunification efforts." *In re Alexander T.*, supra, 81 Conn. App. 672.

"We analyze the trial court's decision in light of the evidence in the entire record to determine whether the decision was clearly erroneous. . . . We make every reasonable presumption in favor of the court's decision. . . . The interest of parents in raising their children, and in their children in general, is a fundamental right. That right warrants deference and protection. . . . Termination of parental rights does not follow automatically from parental conduct that might justify the removal of a child from the natural parental home. . . . While observing the proper deference for the parent-

child relationship, we note that the department must make a *reasonable* effort at reunification, not every *possible* effort." (Citations omitted; emphasis in original.) Id., 672–73.

The respondent father claims that the department failed to make reasonable efforts to reunify him with his son because the department did not contact him until his son was almost seven months old. In support of his argument, the respondent father cites *In re Vincent B.*, 73 Conn. App. 637, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003). *In re Vincent B.*, however, is inapposite. In that case, the department determined that because the respondent father had failed to benefit from its services to achieve reunification with his two other children, he also would be unwilling, or unable, to benefit from any services aimed at reunification with the child who was the subject of the termination petition in that case. Id., 642–44. This court overturned the termination of the respondent's parental rights because the department had not made *any* efforts at reunification after the respondent father successfully completed an inpatient substance abuse treatment program. Id., 645–47.

Contrary to the factual underpinnings of *In re Vincent B.*, the record in this case shows that the department made reasonable efforts to reunify the respondent father with his son. While the respondent father was incarcerated, the department routinely communicated with his mother, who acted as a messenger to him. The court reasonably could have concluded that those contacts with the paternal grandmother were in furtherance of an effort to reunify the respondent father with his son under the circumstances. Additionally, the department twice brought the child to the correctional facility for visits with the respondent father. While the respondent father was incarcerated, the department could not offer him services, but it advised him to take

advantage of the programs offered by the department of correction. After the respondent father's release from incarceration, the department did refer him for substance abuse evaluations, most of which he missed. On August 14, 2003, he did attend a substance abuse evaluation at which he denied having used in the past cocaine, in crack or powder form, even though he previously admitted to Grenier that he had used cocaine. The department also referred the respondent father to parenting classes, but he did not take advantage of those services, either.

On the basis of the foregoing, the court reasonably could have concluded that the department had made reasonable efforts to reunify the respondent father with his son and that the respondent father was unable or unwilling to benefit from them.

B

The respondent father next claims that there was insufficient evidence to support the court's finding of abandonment and, therefore, that the court improperly proceeded to the dispositional phase of the termination proceeding. We disagree.

"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [§ 17a-112 (j) (3) (A)] defines abandonment as the fail[-ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . .

"Section 17a-112 [(j) (3) (A)] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern. The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 185, 193, 763 A.2d 37 (2000).

A review of the record reveals that the court reasonably found that the respondent father had abandoned his son and manifested no continuing, reasonable degree of interest, concern or responsibility for his son. While the father's imprisonment alone did not constitute abandonment, it did not excuse his failure to attempt either to contact or to visit with his son. See id., 194. The record demonstrates that while in prison, the respondent father made almost no effort to contact his son, to inquire about his welfare or to have his son visit with him. Upon release from prison, the respondent father made few efforts to contact his son. When he did visit with his son, the visit was very brief. His efforts may best be characterized as minimal or sporadic. Additionally, the respondent father has never paid child support for Jermaine. We conclude that the court's finding that the respondent father abandoned his son is legally and logically correct, supported by the record and not clearly erroneous.

## C

The respondent father also claims that the court improperly concluded that termination of his parental rights was in the best interest of Jermaine. We disagree.

As we previously stated, "[o]n appeal, we will disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous." (Internal quotation marks omitted.) *In re Vanna A.*, supra, 83 Conn. App. 26–27. The court's findings in that regard are supported by the evidence in the record. Jermaine has been in foster care since he was discharged from the hospital at birth. Jermaine is living with his half brother, Jermale, in a secure foster home. The record reveals that Jermaine has no present positive memories of the respondent father and is emotionally attached to his foster parents. Furthermore, the foster parents are committed to adopting Jermaine and Jermale. The grandmother has expressed ambivalence about becoming a guardian to Jermaine and Jermale, and has not taken any substantial steps toward becoming a parental resource for them. Considering that Jermaine is in a potentially permanent placement with his half brother, the court reasonably could have concluded that it was in Jermaine's best interest to remain in a home in which he is receiving proper care and nurturing. On the basis of the facts contained in the record, we conclude that it was not clearly erroneous for the court to have found that it was in the best interest of the child to terminate the parental rights of the respondent father.

The judgments are affirmed.

In this opinion the other judges concurred.