******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE LARRY D.*
(AC 39478)

Sheldon, Mullins and Flynn, Js.

*Argued January 3—officially released January 31, 2017***

(Appeal from Superior Court, judicial district of New
Haven, Conway, J.)

*David B. Rozwaski*, assigned counsel, for the appel-
lant (respondent father).

*Daniel M. Salton*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Opinion*

FLYNN, J. The respondent father appeals from the judgment of the trial court, rendered in favor of the petitioner, the Commissioner of Children and Families, terminating his parental rights with respect to his minor son, Larry D.[1] On appeal, the respondent claims that the court violated his due process rights by ordering him to participate in a psychological evaluation without first appointing him counsel and advising him of his rights. We affirm the judgment of the trial court.

The record discloses the following relevant facts, which are uncontested or were found by the trial court, and procedural history. Larry was born in November, 2014. On January 8, 2015, after receiving reports suggesting that Larry's mother, Charla J., was unable to provide Larry with proper care, the petitioner obtained an order granting the petitioner temporary custody of Larry. The petitioner filed a neglect petition that same day. On January 16, 2015, the petitioner cited the respondent into the neglect proceedings as a putative father[2] and obtained an order requiring the respondent to submit to a paternity test.

The respondent was served with the neglect petition on February 24, 2015, at a residence subsequently determined to be his usual place of abode. Nevertheless, on the March 10, 2015 plea date, the respondent failed to appear and a default was entered against him. That same day, Larry was adjudicated neglected and committed to the care and custody of the petitioner. On August 25, 2015, the petitioner filed a petition to, inter alia, terminate the respondent's parental rights as to Larry; see footnote 1 of this opinion; on grounds of abandonment, failure to rehabilitate, and the lack of an ongoing parent-child relationship.

The respondent, despite having been properly served, failed to appear at his September 25, 2015 plea hearing on the termination of parental rights petition, and a default was entered against him. As a result, the respondent was not appointed counsel to represent him in the termination proceedings. The respondent again failed to appear at the October 22, 2015 permanency plan hearing. At that hearing, the petitioner obtained an order requiring the respondent to participate in a psychological evaluation. On November 30, 2015, the respondent was incarcerated. After learning of the respondent's incarceration, the court issued a writ of habeas corpus to secure his participation in the psychological evaluation, which was conducted at the courthouse on January 8, 2016, by Ines Schroeder, a forensic psychologist.

The respondent appeared in court for the first time on February 25, 2016. At that time, the court vacated the default previously entered against the respondent, appointed counsel to represent him in the termination

proceedings, and advised him of his rights. Furthermore, the court ordered the defendant to submit to a paternity test,[3] which ultimately established that he was Larry's biological father and resulted in a judgment of paternity being entered on April 7, 2016.

A trial on the termination petition was held on June 7 and 15, 2016. The respondent was represented by counsel throughout the proceedings. The petitioner presented several exhibits and called multiple witnesses, including Dr. Schroeder, who opined, on the basis of her psychological evaluation of the respondent, that there were a "number of things" the respondent needed to address before he could serve as a father figure to Larry, and that it was not in Larry's best interests to wait for the respondent to rehabilitate. The respondent did not object to any of Dr. Schroeder's testimony. Dr. Schroeder's report of her evaluation of the respondent was admitted as a full exhibit by the parties' agreement.

The court issued a memorandum of decision on June 21, 2016, granting the petition to terminate the respondent's parental rights. The court found that the petitioner had proved by clear and convincing evidence that the Department of Children and Families (department) had made reasonable efforts to locate the respondent and reunify him with Larry and, moreover, that the respondent was unwilling to benefit from those reunification efforts. See General Statutes § 17a-112 (j) (1). In particular, the court noted the respondent's continued, deliberate evasion of consistent attempts by the department to engage him in late 2014 and throughout 2015 concerning paternity testing and his visitation rights; indeed, the court found that "[i]t was only with the commencement of [the respondent's] protracted incarceration on or about November 30, 2015, [that he] bec[a]me responsive to [the department's] inquiries or offers of paternity testing."

Next, the court found that the petitioner had proven by clear and convincing evidence all three grounds for termination asserted in the petition. First, with respect to the ground of abandonment; see General Statutes § 17a-112 (j) (3) (A); the court began by determining that, under the circumstances of the present case, the fact that the respondent's paternity was not established until "March or April" of 2016 did not preclude a finding of abandonment. The court found that, despite Charla J.'s initial suggestion that Edward D. was Larry's father, the respondent "did in fact perceive himself" to be the father. The court also noted that the petitioner "aggressively" sought paternity testing of the respondent and Edward D., to which the respondent refused to submit in order to avoid arrest and incarceration on outstanding criminal warrants. As to whether the respondent's conduct amounted to abandonment, the court observed that, so long as the respondent was free in the community rather than incarcerated, "he was content to be

perceived as Larry's father without any of the responsibilities or consequences attendant to fatherhood." The court concluded that the respondent's "evasion of paternity testing, and his contentment with merely being perceived to a limited few as [Larry's] father, without assuming any financial, emotional, or physical support of his young son, constitutes abandonment."

Second, the court found that, pursuant to § 17a-112 (j) (3) (B) (i), Larry had been adjudicated neglected or uncared for in a prior proceeding on March 10, 2015, and that the respondent had failed to demonstrate that he had sufficiently rehabilitated so as to encourage the belief that he could assume a responsible role in Larry's life within a reasonable period of time. In reaching that conclusion, the court relied, in part, on the information elicited from the respondent by Dr. Schroeder during the psychological evaluation. Specifically, the respondent told Dr. Schroeder that he was ready to "sign [his] rights over" and acknowledged, "If I can't take care of myself, I can't take care of [Larry]." Furthermore, citing Dr. Schroeder's report, the court found that the respondent suffered from a variety of mental health issues stemming from his traumatic childhood, including depression, posttraumatic stress disorder, bipolar disorder, anxiety, and recurring nightmares. The court described the respondent's mental health issues as inadequately treated and "severe in intensity and duration." The court found it "telling" that, in each of the three instances in which Larry was brought to visit the respondent in prison, the respondent either terminated the meeting early or refused to show up at all. The court attributed this behavior to the respondent's "significant untreated mental and emotional issues and a genuine fear and lack of knowledge about how to interact with young children . . . ." Crediting Dr. Schroeder's opinion that the respondent's mental health issues needed to be addressed before reunification would be in Larry's best interests, the court concluded that "[i]t is not in [Larry's] best interest to remain in foster care for the foreseeable future, awaiting to see what, if anything, [the respondent] chooses to do regarding his multifaceted issues upon his release from prison next month."

Third, the court found that the petitioner had presented clear and convincing evidence that the respondent lacked an ongoing parent-child relationship with Larry. See General Statutes § 17a-112 (j) (3) (D). The court reasoned that, given the respondent's consistent absence from Larry's life and failure to take advantage of the department's early 2015 attempt to arrange for visitation, "[n]o parent child relationship was ever established." Furthermore, relying on the "reasons articulated in the previously discussed adjudicatory grounds," the court determined that "allowing further time to elapse to determine if such a parent-child relationship could be established in the future would be

detrimental to [Larry]."

Finally, after considering and issuing written findings as to the factors set forth in § 17a-112 (k), the court found that terminating the respondent's parental rights was in Larry's best interests. In reaching that conclusion, the court relied on the following facts. The respondent evaded all contact with the department, including its offer to arrange for visitation, until he was incarcerated. The court previously issued specific steps that set forth the respondent's obligations to make reunification viable. Larry was "thriving" while under foster care. The respondent either terminated his supervised visits with Larry early or refused to participate at all, despite the fact that Larry had traveled over an hour to visit him in prison, which "is not in the child's best interest." Although the respondent was scheduled to be released from prison the following month, he entirely failed to establish a relationship with Larry despite having been provided an opportunity to do so. Thus, the court concluded that the respondent's "attendance and behaviors at prison visits since December, 2015, do not support a finding, in light of the other findings previously made, that it would be in [Larry's] best interest to stay in foster care to give [the respondent] time to reintegrate back into society and to see if he could be a potential resource for his son."

Accordingly, the court terminated the respondent's parental rights as to Larry. This appeal followed.

The respondent claims that the court's failure to advise him of his constitutional rights and to appoint him counsel prior to ordering his participation in a psychological evaluation violated his due process rights. Acknowledging that he failed to preserve this claim in the trial court by objecting to the admission of Dr. Schroeder's report into evidence, the respondent seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We conclude that the alleged constitutional violation was harmless beyond a reasonable doubt.[4]

Under *Golding*, "an appellant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the [respondent's] claim will fail." (Internal quotation marks omitted.) *In re Yasiel R.*, 317 Conn. 773, 779, 120 A.3d 1188 (2015); see id., 781. Furthermore, "[t]he appellate tribunal is free . . . to respond to the [respondent's] claim by focusing on whichever condi-

tion is most relevant in the particular circumstances." (Internal quotation marks omitted.) *In re Lukas K.*, 120 Conn. App. 465, 472, 992 A.2d 1142 (2010), aff'd, 300 Conn. 463, 14 A.3d 990 (2011).

In the present case, we conclude that the respondent's claim fails the fourth *Golding* requirement because the alleged constitutional violation was harmless beyond a reasonable doubt. Accordingly, we need not address the first three *Golding* requirements. See *State* v. *Golding*, supra, 213 Conn. 241–42 ("In many cases of an alleged constitutional violation . . . the state is able to demonstrate the harmlessness of such alleged violation beyond a reasonable doubt. . . . Under such circumstances, it would be a waste of judicial resources, and a pedantic exercise, to delve deeply into the constitutional merits of a claim that can appropriately be resolved in accordance with the relevant harmless error analysis." [Citations omitted.]); see also *State* v. *Dickson*, 322 Conn. 410, 497, 141 A.3d 810 (2016) (*Robinson, J.*, concurring); *State* v. *Kulmac*, 230 Conn. 43, 64–65, 644 A.2d 887 (1994).

The respondent argues that, as a result of the court's failure to appoint counsel or canvass him prior to ordering his participation in the psychological evaluation, he participated in the evaluation without the benefit of counsel or knowledge of his rights, which caused him to provide Dr. Schroeder with information that was used against him in the termination proceedings. A review of the court's factual findings and reasoning, however, makes abundantly clear that Dr. Schroeder's evaluation did not form the basis for the court's decision to terminate the respondent's parental rights. The court terminated the respondent's parental rights on three independent grounds—abandonment, failure to rehabilitate, and the lack of an ongoing parent-child relationship—and the court relied upon the information gleaned from the evaluation only in support of its finding of failure to rehabilitate. The court did not rely upon the evaluation in support of its findings of abandonment or the lack of an ongoing parent-child relationship, each of which are independently sufficient to support the court's decision to terminate the respondent's parental rights. See *In re Jermaine S.*, 86 Conn. App. 819, 822 n.4, 863 A.2d 720 ("[w]e may affirm the court's decision if we find that it properly concluded that any one of the statutory circumstances [under § 17a-112 (j) (3)] existed" [internal quotation marks omitted]), cert. denied, 273 Conn. 938, 875 A.2d 43 (2005). The respondent has not challenged any of the court's findings with respect to these alternative grounds for termination.

Furthermore, in finding that terminating the respondent's parental rights was in Larry's best interests, the court relied not on the information obtained by Dr. Schroeder, but on the respondent's failure to appear in court, evasion of the petitioner's attempts to establish

paternity, and erratic behavior during visits with Larry.[5] On that basis, we conclude that the petitioner has established beyond a reasonable doubt that, even without the allegedly tainted evidence derived from Dr. Schroeder's evaluation, the court's ultimate decision to terminate the respondent's parental rights would have remained the same. Accordingly, any error was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 31, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] In the same proceeding, the court also terminated the parental rights of Larry's mother, Charla J. Additionally, the court terminated the parental rights of Charla J. and another individual, Wayne B., as to their minor daughter, Leah B. Because Charla J. and Wayne B. have not appealed from those judgments, we refer to Larry's father as the respondent throughout this opinion.

[2] The temporary custody order and neglect petition originally identified another individual, Edward D., as Larry's biological father. Subsequently, after paternity testing, conducted in February, 2015, determined that Edward D. was not Larry's biological father, he was dismissed from the case.

[3] The respondent failed to appear at the previously scheduled paternity test, which had been ordered in January, 2015. At the trial on the termination petition, the respondent testified that he elected not to attend the paternity test because in early 2015 he received a letter from the department informing him that Edward D. was Larry's father. See footnote 2 of this opinion. The court explicitly discredited this testimony in its memorandum of decision, finding instead that, "[c]learly, [the respondent] evaded [the department's] attempts to contact him and to engage with him because he feared incarceration on outstanding criminal arrest warrants. Only upon his protracted period of incarceration that commenced on . . . November 30, 2015, did [the respondent] become responsive to [the department's] inquiries or offers of paternity testing."

[4] Although the respondent suggested in his original brief, without any accompanying legal analysis, that this court should exercise its supervisory authority to reverse the court's judgment, he clarified at oral argument that he was not pursuing that claim.

[5] Although Dr. Schroder opined that terminating the respondent's parental rights would be in Larry's best interests—an opinion the court credited in support of its finding that the respondent had failed to rehabilitate—the court did not rely on that opinion when analyzing the § 17a-112 (k) criteria in the dispositional portion of its decision.