### IN RE RACHEL J. ET AL.*
(AC 26768)

Bishop, Rogers and West, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

■■■■■■

Argued June 1—officially released October 3, 2006

*Raymond J. Rigat,* for the appellant (respondent mother).

*Paula D. Sullivan,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Opinion*

ROGERS, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to R and N, her two minor children.[1] On appeal, she claims that the court (1) improperly concluded that R sustained a serious bodily injury under General Statutes § 17a-112 (j) (3) (F)[2] and (2) erroneously found that it was in R's best interest to terminate the respondent's parental rights. We affirm the judgments of the trial court.

The relevant facts are as follows. The respondent is a forty year old woman with a history of involvement with the department of children and families (department) dating back to her childhood when, at the age of nine, she was placed in the department's care due to the substance abuse and mental health problems of her mother. The two children who are the subject of the termination are R, born September 24, 1993, and N, born May 30, 2002.[3] In 1999, the department received a report from a teacher that R, six years old at the

[1] The court also terminated the parental rights of R's father. Because he has not appealed, we refer in this opinion to the respondent mother as the respondent.

[2] General Statutes § 17a-112 (j) (3) (F) authorizes the trial court to terminate parental rights if it finds by clear and convincing evidence that a parent "has committed an assault, through [a] deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent . . . ."

[3] Guardianship of a third child, L, born in 1986 and not a subject of the present proceedings, was transferred to L's paternal grandmother in 1997 following confirmation of physical abuse and physical and emotional neglect on the part of the respondent.

time, was exhibiting sexually explicit behavior in the classroom. The department investigated the report, but did not open a case on the matter. The department received a similar report in 2001, which stated that R had told her teacher that the respondent's boyfriend, F, had kissed her and touched her vaginal area. The report stated further that R had exposed herself in the classroom and touched other children in a sexually inappropriate manner. The department investigated and substantiated the report, and the respondent signed a service agreement-safety plan that required her, inter alia, to refrain from using any form of physical discipline, not to allow her child to witness acts of violence and not to permit F into her apartment. Despite that agreement, the respondent and F continued their relationship, and their child, N, was born on May 30, 2002. The child was born with spina bifida, bilateral subluxed hips and bilateral club feet, all of which required surgery. As a result, N wears braces on both legs twenty-three hours a day and requires catheterization multiple times each day.

The next report to the department came in August, 2003, following a domestic violence altercation between the respondent and F that occurred in the respondent's apartment. On that occasion and in the presence of R and N, F lost his temper, grabbed the respondent by the throat and forced her against a wall, which led to his arrest. The respondent thereafter signed another service agreement-safety plan that required, inter alia, that she not permit F to have unsupervised contact with the children and that she provide appropriate adult supervision twenty-four hours a day.

On the morning of December 19, 2003, the respondent assaulted R. As the court stated in its memorandum of decision: "[R] was slow in getting out of bed for school. At about 8 a.m., [the respondent] was trying to get [R] up, knowing the school van would come for her

between 8:30 and 8:35 a.m. [The respondent] threatened to spank [R] if she did not get up. [R] responded by saying that she was sick and tired of getting spanked and told [the respondent], 'I hate you.' [The respondent] then grabbed [R] by the hair, pulled her out of bed, essentially threw her to the middle of the room and dropped her to the floor. [R] hit her elbow on the floor, causing a severe fracture." R did not attend school for days; rather, the respondent kept her home until the holiday break arrived. The respondent did not seek any medical treatment for R during that time.

The court stated further: "Several days later, on December 23, 2003, [a department] social worker . . . had a home visit with the family. When she arrived, [the respondent] told [her] that [R] was at a friend's house. In reality, [R] was hiding from the worker at [the respondent's] direction. [The respondent] later admitted that she hid [R] because she was afraid [R] would be taken from her care if the worker saw [R's] injury. That night, knowing [the department worker] would be returning the following day, [the respondent] finally took [R] to [a hospital] for treatment. . . . On December 24, 2003, [the department worker] made another visit to the home at which time [the respondent] and [R] falsely stated to the worker that the injury was accidentally caused by [R's] jumping up and down on one foot. [R] ultimately had a cast placed on her arm . . . . On January 8, 2004, [the department] arranged to interview [R] at school outside the presence of [the respondent]. At that time, she told [the department worker] initially that [F had] inflicted the injury. She also described her injuries, stating that her elbow was purple, black and swollen and hurt a lot, causing her to cry every day. After further investigation, police officers confronted [the respondent], who first also stated that [F had] caused the injury, but later admitted that she caused the injury to [R. The respondent] was arrested

and charged with assault in the third degree and risk of injury to a [child]. . . . On January 8, 2004, [R] and [N] were placed in [the department's] care as a result of a ninety-six hour hold. On January 12, 2004, coterminous petitions [to terminate the respondent's parental rights] were filed, and orders of temporary custody were issued by the court . . . ."

R subsequently was placed with a foster mother, who observed R's aggressive behavior toward other children, which included hitting, pushing and tripping. The foster mother also observed R's "highly charged sexual conduct" and frequent masturbation, at one point asking R where she had learned such behavior. R replied that the respondent forced her do it while watching pornographic films with her. R explained that "if she didn't want to do it, her mother made her do it anyway." In addition, R told her foster mother that the respondent "would always pull her hair [and] would hit her with wooden spoons."

A trial commenced in February, 2005, at which the court heard testimony from multiple therapists. Psychologist Mary H. Cheyne conducted clinical evaluations of both the respondent and R. Cheyne found that R had a bond with the respondent and noted "some indications that R holds herself responsible for her removal from the respondent's care." Cheyne opined that R is in need of "intensive psychological, individual therapy." As to the respondent, Cheyne concluded that she "struggles with anger management issues, domestic violence issues and inadequate parenting skills, particularly related to a child with [attention deficit hyperactivity disorder]. Of prime concern is her apparent tendency to value corporal punishment as a means of discipline."

Therapist Stephanie Mancini treated R for a period of eleven months between 2004 and 2005. During those

sessions, R told Mancini that "it was hard to love someone when they hit you and that she was mad, sad and scared when the respondent pulled out her hair." R stated that, in her foster home, she "didn't get slapped anymore" and told Mancini of an incident where the respondent "touched [her] vagina." Mancini testified that R was conflicted in her feelings toward the respondent and felt obligated to her, stating that "she is my [m]om, you know." Mancini opined that R needed to be in a setting that was safe and free from abuse, and that would provide support and therapy and which was both stable and long term.

Clinician Suzanne Cohen-Freylikhman conducted a trauma evaluation with R during which R recanted her claim that F had sexually abused her and stated that the respondent had been the perpetrator. R said that she had "made up a bad lie" to protect the respondent and told Cohen-Freylikhman that the respondent "would make her masturbate while watching dirty movies." Cohen-Freylikhman recommended that R be placed in a therapeutic foster home without young children due to R's physical and sexual behavior toward other children.

The court issued a thorough and well reasoned memorandum of decision on June 3, 2005, in which it found that there was ample evidence that R and N were neglected in that they were denied proper care and attention and permitted to live under conditions or associations injurious to their well-being. The court found that "the extreme injury inflicted on [R], and [the respondent's] subsequent failure to obtain medical treatment for many days amounted to a denial of proper care and attention of both children . . . . [R] has been abused and received a serious physical injury that was inflicted by other than accidental means." In addition, the court found that the respondent exposed R to sexual abuse. It stated: "Whether the abuse was perpetrated by

[the respondent] or by [F] as [the department] originally believed, in either instance, both children were permitted to live in a home where sexual abuse occurred. [R's] significant behavioral problems demonstrate the serious effect the abuse has had on [R]." As to N, the court specifically found that "the domestic violence and physical and emotional abuse of [R] created an environment in the home such that [N] was denied proper care and attention physically, educationally, emotionally or morally and was permitted to live under conditions, circumstances or associations injurious to her well-being." The court further found that "the fact that [the respondent] severely injured [R] after entering into [two service] agreements is further evidence that the children were neglected."

Finding that both children were neglected, the court turned its attention to the termination petitions. As to R, the only ground alleged in the termination petition was that the respondent, as a result of sexual molestation and severe physical abuse on her part, denied R the care, guidance or control necessary for her physical, educational, moral or emotional well-being under § 17a-112 (j) (3) (C). The court found by clear and convincing evidence that R's injuries at the hands of the respondent constituted nonaccidental serious physical injuries to a child. It found further that the respondent's "failure to obtain medical treatment for [R] for days after the injury constituted an act of parental omission that . . . denied her the care, guidance and control necessary for her well-being. Moreover, [the respondent] only took [R] for treatment after learning that [the department worker] and [the] father were planning to see [R] the following day." The court found that, in addition to serious physical injury, R suffered serious emotional injury and sexual abuse while living with the respondent. Accordingly, the court concluded that the respondent denied R, by reason of acts of parental commission

and omission, the care, guidance or control necessary for her physical, educational, moral or emotional well-being.

As to N, the sole ground alleged in the termination petition was that the respondent "committed an assault, through [a] deliberate non-accidental act that resulted in serious bodily injury of another child . . . of the parent" under § 17a-112 (j) (3) (F). The court found that, at trial, there was no real dispute as to whether the respondent's actions resulted in serious bodily injury to R or that the respondent failed to seek medical attention for R for several days thereafter. It continued: "[Section 17a-112 (j) (3) (F)] clearly sets out as a ground for termination of parental rights the assault of another child in the home. Here, although [N], a very young, medically fragile child, was not the subject of the physical abuse, she lived in the home with [R] and [the respondent] and was subjected to an atmosphere which resulted in the severe assault of her sister. The court finds by clear and convincing evidence that this ground has been proven."

The court also considered the seven factors delineated in § 17a-112 (k) and whether termination was in the best interests of the children. The court noted that "[a]lthough [the respondent] clearly loves her children, her long-term personal history of violence against her own children as demonstrated by [the respondent's] losing guardianship of [her first daughter, L] as a result of physical abuse, weighs strongly in favor of termination. . . . [The respondent] clearly should have understood or learned as a result of her experience with [L] that such physical violence could not be inflicted on her children. Nevertheless . . . [the respondent] continued to engage in conduct that required [the department's] involvement." The court therefore found that termination of the respondent's parental rights was in

the best interests of R and N and rendered judgment accordingly. This appeal followed.

I

The respondent first claims that the court improperly concluded that R sustained a serious bodily injury under § 17a-112 (j) (3) (F). That statute authorizes a trial court to terminate parental rights if it finds by clear and convincing evidence that a parent "has committed an assault, through [a] deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent . . . ." It is undisputed that the respondent committed an assault against N's sibling through a deliberate, nonaccidental act that resulted in bodily injury. The dispositive question is whether it resulted in serious bodily injury to the child.

A

The respondent argues that she preserved this claim for appeal. During summation, counsel for the respondent stated: "If we are going to look at the basis of the coterminous petition being the injury to the elbow, precious little testimony was offered with regards to that to make [it] the basis for asking for the termination of both [R] and [N]." We therefore focus our attention on whether the court's conclusion that R sustained a serious bodily injury finds evidentiary support in the record. "Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have

reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jermaine S.*, 86 Conn. App. 819, 826–27, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005).

At trial, the court heard testimony regarding the December 19, 2003 assault of R by the respondent. Lisa Peterson-Blinn, a social worker with the department, was asked how the respondent explained that assault. Peterson-Blinn testified that the respondent told her that "[R] was getting ready for school, she wasn't moving fast enough [and that] she, [R], said to her, I'm tired of you yelling and hitting me. I guess she pulled her hair a lot. And [R] said, I hate you. And when [R] said that to [the respondent, the respondent] picked her up by the hair and the arm and threw her, causing her to hit her arm on the floor and break it." Moreover, R detailed the assault to Cheyne as follows: "[The respondent] was trying to wake me up. I gave her a fit and said I hated her. I was getting dressed and she ran over, grabbed my hair, held my arm and threw me on the floor." At trial, the respondent admitted to causing R's injuries, stating that "before I knew it, I had taken her by the hair and pulled her across the floor and she had come down on her elbow."

In evaluating the severity of R's injury, the court also heard testimony concerning the respondent's failure to seek medical attention for R for almost five days following the assault, despite the fact that the elbow was fractured. It was undisputed at trial that the respondent purposely kept R home from school and did not seek medical attention due to her fear of department intervention. As R stated to investigator Pedro Nunez, who interviewed R on January 8, 2004, her elbow "hurt a lot and was purple, black and swollen, causing her

to cry every day." When medical attention finally was provided to R, the injuries to the child's elbow required a cast to be placed on her arm so that it was immobilized and could begin healing.

Our standard of review requires us to indulge every reasonable presumption in favor of the court's ruling. *In re Jermaine S.*, supra, 86 Conn. App. 827. In view of the evidence in the record, we cannot say that the determination reached by the trial court that R sustained a serious physical injury is clearly erroneous.

## B

The respondent also asks us to define the term "serious physical injury" as it is used in § 17a-112 (j) (3) (F). Like many other terms contained in our child welfare statutes, that term is not defined by statute. See General Statutes § 17a-93. The respondent suggests that we import the definition supplied by our criminal code.[4] We decline that invitation.

The General Assembly chose not to define the term "serious physical injury" as it is used in our child welfare statutes. It further declined to import the criminal definition provided by General Statutes § 53a-3 (4), despite having done so in other statutes. See, e.g., General Statutes §§ 14-223 and 29-136. As the respondent correctly notes, when a statute does not supply a definition or a term, its "commonly approved usage" governs. General Statutes § 1-1 (a). Our Supreme Court has explained that "[t]o ascertain the commonly approved usage of a word, it is appropriate to look to the dictionary definition of the term." *In re Darlene C.*, 247 Conn. 1, 11 n.29, 717 A.2d 1242 (1998); see also *State* v. *Tutson*, 278 Conn. 715, 732, 898 A.2d 598 (2006). The word "serious" is

---

[4] General Statutes § 53a-3 (4) defines serious physical injury as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ."

defined in Webster's Third New International Diction-
ary as "such as to cause considerable distress, anxiety,
or inconvenience."[5]

The record before us contains ample evidence that
the physical injury R sustained was serious. The assault
by the respondent caused a severe fracture to the child's
elbow. The injury required casting. The distress R
endured as a result of this injury continued for weeks.
Three weeks after the assault occurred, R stated that
her elbow "hurt a lot and was purple, black and swollen,
causing her to cry every day." The seriousness of the
injury was magnified by the respondent's tactical deci-
sion to not seek medical aid for R for almost five days
in an effort to evade department detection. Accordingly,
the court properly found that R suffered a serious physi-
cal injury.

C

The respondent also alleges a denial of her substan-
tive due process rights. The respondent failed to pre-
serve that claim at trial and now requests *Golding*
review.[6] That effort is unavailing. The mere invocation

---

[5] The respondent argues that serious is synonymous with grave or life
threatening. We disagree. Grave is defined as meaning "very serious"; (inter-
nal quotation marks omitted) *State* v. *Peeler*, 271 Conn. 338, 454, 857 A.2d
808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005);
which necessarily suggests some degree greater than serious.

[6] See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under
*Golding*, "a defendant can prevail on a claim of constitutional error not
preserved at trial only if *all* of the following conditions are met: (1) the
record is adequate to review the alleged claim of error; (2) the claim is of
constitutional magnitude alleging the violation of a fundamental right; (3)
the alleged constitutional violation clearly exists and clearly deprived the
defendant of a fair trial; and (4) if subject to harmless error analysis, the
state has failed to demonstrate harmlessness of the alleged constitutional
violation beyond a reasonable doubt." (Emphasis in original.) Id. The first
two questions relate to whether a respondent's claim is reviewable, and the
last two relate to the substance of the actual review. See *State* v. *Jarrett*,
82 Conn. App. 489, 492 n.1, 845 A.2d 476, cert. denied, 269 Conn. 911, 852
A.2d 741 (2004).

of the word "Golding" is insufficient to trigger such review of an unpreserved claim. Rather, analysis is required. "The [respondent's] failure to address the four prongs of *Golding* amounts to an inadequate briefing of the issue and results in the unpreserved claim being deemed abandoned." (Internal quotation marks omitted.) *State* v. *David P.*, 70 Conn. App. 462, 474, 800 A.2d 541, cert. denied, 262 Conn. 907, 810 A.2d 275 (2002). Accordingly, we decline to review this unpreserved claim.

## II

The respondent also claims that the court erroneously found that it was in R's best interest to terminate the parental rights of the respondent. It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the children only if the court's findings are clearly erroneous. *In re Daniel C.*, 63 Conn. App. 339, 367, 776 A.2d 487 (2001).

The respondent offers scant analysis of this claim, which is predicated solely on the court's finding that a bond existed between R and the respondent.[7] Our courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights. See, e.g., *In re Tyqwane V.*, 85 Conn. App. 528, 536, 857 A.2d 963 (2004); *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001); *In re Quanitra M.*, 60 Conn. App. 96, 106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). Furthermore, the existence of a bond between parent and child can spawn negative consequences, such as in this case, in which R attempted to protect the respondent from discovery of the abuse.

[7] The court also found that R had established a bond with her foster parents.

The record reveals that R initially identified F as the perpetrator of sexual abuse in an effort to protect the respondent; as R put it, she "made up a bad lie" to protect her mother. The narrative report of the department's January 8, 2004 interview with R likewise indicates that R originally stated that F had broken her elbow; R later confessed that it actually was the respondent who caused the injury. In addition, R exhibited "some indications that R holds herself responsible for her removal from the respondent's care."

The record also contains evidence that R has strong negative feelings about the respondent. R acknowledged to Cheyne that she worries about the respondent and told Mancini that "it was hard to love someone when they hit you." R also stated that, at her foster home, she "[did not] get slapped anymore." Mancini further testified that R was conflicted in her feelings toward the respondent and felt obligated to her, stating that "she is my [m]om, you know." During one session, R asked Mancini "if she had the right to be mad at [the respondent]." When the department attempted to facilitate reunification with regular visits, R stated that "she did not wish to have a [further] visit because [the respondent] made her feel bad and was always mad at her." Ultimately, R's therapist recommended that visitation be suspended due to the detrimental effect it had on R and R's own expressed desire not to visit because the respondent "made her feel bad." The negative emotional aspects of R's relationship with the respondent amply support the court's finding that it was in the child's best interest to terminate the parental rights of the respondent.

Finally, and perhaps most significantly, whether a bond exists between parent and child is but one consideration that a trial court must contemplate. The record is replete with evidence that the respondent exposed R to physical and sexual abuse, which we already have

discussed in detail. The court also credited the testimony of various therapists who detailed the emotional abuse R endured and her resulting behavioral problems. Additionally, the guardian ad litem for R testified that "R's best interest would be to remain in the foster home, the preadoptive home that she's in, and to continue to finalize that adoption and make her stabilized where she is." In light of the foregoing, we conclude that it was not clearly erroneous for the court to have found that it was in the best interest of the child to terminate the parental rights of the respondent.

The judgments are affirmed.

In this opinion the other judges concurred.