******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PRINCESS Q. H. *v.* ROBERT H.
(AC 35735)

Bear, Keller and Dupont, Js.

*Argued January 13—officially released April 25, 2014\**

(Appeal from Superior Court, judicial district of
Hartford, Carbonneau, J.)

*Doris B. D'Ambrosio*, for the appellant (defendant).

*Princess Q. H.*, self-represented, the appellee
(plaintiff).

*Opinion*

KELLER, J. The defendant, Robert H., appeals from the judgment of the trial court granting the application of the self-represented plaintiff, Princess Q. H., for a domestic violence restraining order pursuant to General Statutes § 46b-15.[1] The defendant claims that the court erroneously determined (1) that he subjected the plaintiff to stalking and (2) that he subjected the plaintiff to a pattern of threatening. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to our analysis. On April 24, 2013, the plaintiff, in a self-represented capacity, filed an application for a domestic violence restraining order seeking immediate relief against her former spouse, the defendant. In her application, the plaintiff averred under oath that she and her daughter had observed the defendant "around [her] home over the months," and, on April 21, 2013, the defendant drove past her home, turned around, and passed by the home a second time. Also, the plaintiff averred that the defendant had contacted her on the telephone on several occasions in 2012; that over the past several weeks she had received prank calls from an unknown caller; that the defendant put his hands around her neck "at one time"; that, when she was married to the defendant, he once told her that "he can protect himself if he had to"; and that she was fearful that the defendant would try to hurt her or her daughter. On April 24, 2013, the court issued the restraining order, which, among other things, prohibited the defendant from possessing firearms; assaulting, abusing, harassing, following, interfering with, or stalking the plaintiff; going near the plaintiff's home; and contacting the plaintiff in any manner. The defendant was ordered to stay at least 100 yards away from the plaintiff. The court's order, following the ex parte application, expired on May 7, 2013.

The parties appeared for a hearing before the court on May 7, 2013. Therein, the defendant, represented by counsel, contested the continuation of the restraining order. At the hearing, the court heard testimony from the plaintiff as well as argument from the defendant's attorney. The plaintiff described an incident that occurred weeks earlier, on a Sunday in April, 2013. She testified that she was at her home, speaking on the telephone with her daughter, who was in the plaintiff's driveway. The plaintiff testified that she learned from her daughter that the defendant had just driven past the home. The plaintiff testified that she attempted "to catch him before he passed," and that he "turned around up the street and came back down [the street]," thereby driving past her home a second time. The plaintiff testified that she observed the "tail" of the defendant's automobile as he drove past the home this second time. The plaintiff testified that, with regard to this incident,

the defendant did not do anything more than drive by the home.

Additionally, the plaintiff testified that on one occasion in the summer of 2012, the defendant called her cell phone from his automobile, "made like it wasn't him, and he hung up the phone. [He] said, sorry, I had the wrong number and hung up the phone." The plaintiff testified that, during the past month, she had received telephone calls "from unidentified numbers . . . ." She acknowledged that she had no way of knowing if the defendant was in any way involved with these telephone calls from unidentified callers.

The plaintiff testified about an incident that occurred in late 2010, stating: "[W]hen we were together—he basically had me under a control that whatever he said was the final law, and . . . one time I was in disagreement with him, and . . . he didn't like my response. I got wise with him, and he put his hands around my neck . . . ." She stated that she did not call the police in connection with this incident, that it did not cause any bruising, and that it lasted "for a few seconds."

The plaintiff testified that the defendant did not make any verbal threats to her, but prior to the incident that occurred in late 2010, he told her "that he could pretty much hold his own if . . . he needed to." The plaintiff also testified that, in 2010, the defendant told her about an incident in which he physically had restrained his daughter. The plaintiff stated that, from his statements, she understood that the defendant had the ability physically to restrain her.

As it related to another incident, the plaintiff testified that, in February or March, 2013, she observed what may have been the defendant's automobile in a shopping center in the town in which she resides, Glastonbury. She said that "[she] wasn't close enough to it to confirm that it was his vehicle." She stated that, as far as she knew, the defendant did not have any legitimate reason to be in the town of Glastonbury.

Throughout her testimony, the plaintiff described the defendant's conduct as "stalking," and stated that she feared him. The record reflects that the plaintiff was crying during her testimony. The plaintiff testified that she had filed bigamy charges against the defendant, but that it did not appear that the authorities intended to pursue the matter. The plaintiff stated that a civil action brought by her was pending against the defendant, and that the matter had not yet reached the trial stage. She emphasized in her testimony that she was very upset by the fact that the defendant was married at the time that he married her.

At the conclusion of the hearing, the court orally rendered its decision.[2] The court stated: "I have had the benefit of [the plaintiff's] testimony. I have also had the benefit of reviewing her affidavit. Specifically . . .

[on] a Sunday in late April [2013] . . . it was the daughter [of the plaintiff] who initially may have spotted [the defendant] in Glastonbury on the public street nearby [the plaintiff's] home. But she also says under oath, he turned around up the street and proceeded to come back, passing by the house again. That . . . vindicates her testimony, to some extent, saying that she would have had time to come out [of the house] and see [the defendant drive by the house].

"The court will not speculate as to the reasons that [the defendant] might have been in the region. I have no evidence one way or the other. This is not a case where [the plaintiff] is telling me about a physical threat, or physical pain or physical injury, save for the allegations of a physical confrontation in 2010; but she has described and claimed that [the defendant] is stalking her, and she has tried to present a pattern of threatening that she feels.

"Having reviewed the legislative history behind this statute, I find that [the plaintiff's] testimony is credible in this regard. And after very carefully listening to her testimony, weighing all of the evidence before me, I find she has sustained her burden under § 46b-15, that the [defendant's] actions from 2010 forward have created a pattern of threatening that she feels. I disagree with [the] assessment [of the defendant's counsel]. Stalking can be, I think, one incident.

"The court was given no reason that [the defendant] was in Glastonbury particularly, driving by not once, but twice, [the plaintiff's] home. And for that basis, I find her testimony credible, and I grant the restraining order as she requested." Thereafter, the court explained the various limitations on the rights and privileges of the defendant that were part of its restraining order, which, by its terms, expires on May 7, 2014. This appeal followed. Later, the court granted a motion for articulation brought by the defendant and, in an articulation of its decision dated July 12, 2013, the court stated, in relevant part: "The court did not rule that one act could constitute 'stalking' in its decision of May 7, 2013." Additionally, the court stated: "After finding [the plaintiff's] testimony credible, the court applied Connecticut General Statutes Section 46b-15, specifically its 'stalking' and 'pattern of threatening' provisions."

The defendant claims that the court erroneously determined that his conduct rose to the level of stalking or a pattern of threatening under § 46b-15 (a). Specifically, he argues that the evidence did not demonstrate that he had contacted the plaintiff in any manner from 2010 until the time of trial in 2013, and, thus, that he could not have threatened the plaintiff. Further, the defendant argues that the plaintiff's testimony that he drove past her home in April, 2013, did not support a determination that he engaged in stalking. To a large extent, the defendant argues that the plaintiff's testi-

mony did not demonstrate that he engaged in stalking because his conduct in driving past the plaintiff's home was isolated to a single occurrence and did not rise to the level of stalking as set forth in provisions of the Penal Code, specifically General Statutes § 53a-181d (stalking in the second degree) or General Statutes § 53a-181c (stalking in the third degree).

Before turning to a consideration of these claims, we set forth our standard of review. "[T]he standard of review in family matters is well settled.[3] An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Footnote added; internal quotation marks omitted.) *Rosemarie B.-F.* v. *Curtis P.*, 133 Conn. App. 472, 475–76, 38 A.3d 138 (2012). Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. "It is axiomatic that a matter of law is entitled to plenary review on appeal." *Crews* v. *Crews*, 295 Conn. 153, 162, 989 A.2d 1060 (2010).

To the extent that the defendant's claims raise issues of statutory interpretation, we note that "[i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . General Statutes § 1-2z directs this court to first consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning is plain and unambiguous and does not yield absurd or unworkable results, we shall not consider extratextual evidence of the meaning of the statute. . . . Only if we determine that the statute is not plain and unambiguous or yields absurd or unworkable results may we consider extratextual evidence of its meaning such as the legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement . . . its relationship to existing legislation and common law principles governing the same general subject matter . . . . The

test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . We presume that the legislature did not intend to enact meaningless provisions. . . . [S]tatutes must be construed, if possible, such that no clause, sentence or word shall be superfluous, void or insignificant . . . .

"Furthermore, [i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly. . . . If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Marchesi* v. *Board of Selectmen*, 309 Conn. 608, 614–16, 72 A.3d 394 (2013).

Section 46b-15 (a), which governs this case, provides in relevant part: "Any family or household member as defined in section 46b-38a,[4] who has been subjected to . . . stalking or a pattern of threatening, including, but not limited to, a pattern of threatening, as described in section 53a-62, by another family or household member may make an application to the Superior Court for relief under this section." (Footnote added.)

## I

First, we address the claim that the court erroneously determined, on the basis of its findings of fact and interpretation of § 46b-15 (a), that the defendant had subjected the plaintiff to stalking. Although the court, in its findings, which are set forth previously, discussed in some detail the incident in April, 2013, in which the defendant twice drove past the plaintiff's home, it appears that the court also accepted as true the entirety of the plaintiff's testimony. The court referred to the stalking provision of § 46b-15 (a) in both its oral decision and its articulation, yet in neither circumstance did the court set forth its interpretation of that statutory provision. In its decision, the court stated that "stalking can be . . . one incident," and later stated that "[t]he court did not rule that one act could constitute 'stalking' . . . ."

The legislature did not provide a definition of "stalking" as that word is used in § 46b-15 (a). Although it could have done so,[5] it did not incorporate by reference the definitions of "stalking" that are contained in the Penal Code, specifically, § 53a-181d[6] and General Statutes § 53a-181e.[7] Accordingly, we look to the commonly approved usage of the word stalking. See *O'Dell* v. *Kozee*, 307 Conn. 231, 243–44, 53 A.3d 178 (2012) (declining to rely on Penal Code definition but relying on commonly approved usage); *In re Rachel J.*, 97 Conn.

App. 748, 759–60, 905 A.2d 1271 (same), cert. denied, 280 Conn. 941, 912 A.2d 476 (2006).

"Stalking" is defined as "[t]he act or an instance of following another by stealth. . . . The offense of following or loitering near another, often surreptitiously, to annoy or harass that person or to commit a further crime such as assault or battery." Black's Law Dictionary (9th Ed. 2009). To "loiter" means "to remain in an area for no obvious reason." Merriam-Webster's Collegiate Dictionary (11th Ed. 2011). We interpret the statute in accordance with these commonly accepted definitions, satisfied that the plain meaning of the statute does not yield an unworkable or absurd result. We reject the defendant's reliance on the narrower definitions of stalking codified in our Penal Code. In so doing, we are mindful that our legislature reasonably may have chosen to rely on a narrower definition of stalking in delineating criminal liability, while deciding that a broader definition of stalking was appropriate in the dissimilar context of affording immediate relief to victims under § 46b-15. See *Putman* v. *Kennedy*, 104 Conn. App. 20, 25–26, 932 A.2d 439 (2007) ("[t]he legislature promulgated § 46b-15 to provide an expeditious means of relief for abuse victims").

In the present case, the court found, consistent with the plaintiff's testimony, that the defendant, a resident of West Hartford, drove past the plaintiff's home in Glastonbury, turned around, and drove past the home a second time in the opposite direction. The defendant did not stop his automobile or otherwise interact with the plaintiff or her daughter, who was in the plaintiff's driveway. Certainly, neither this court nor the trial court was bound by the plaintiff's description of this conduct as "stalking," for such terminology has a technical legal significance. We recognize, additionally, that the defendant's conduct might have been completely unrelated to stalking the plaintiff. The court, however, was not presented with evidence of such a benign explanation, but heard ample evidence about the parties' stormy relationship and the fact that the plaintiff and the defendant were adverse parties in a civil action at the time of this occurrence.

As has often been noted, "trial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . as [t]he conclusions which we might reach, were we sitting as the trial court, are irrelevant." (Citations omitted; internal quotation marks omitted.) *Rostain* v. *Rostain*, 214 Conn. 713, 715–16, 573 A.2d 710 (1990). In light of the evidence and the surrounding circumstances, we conclude that the court did not abuse its discretion in

concluding in the context of all of the evidence presented to it that the defendant's conduct in driving past her home, turning around, and immediately driving past her home a second time constituted an act of stalking. The court found after consideration of the evidence that shortly before the plaintiff sought relief under § 46b-15, the defendant acted in a manner that constituted stalking as that term is commonly defined and applied. The defendant did not testify as to any contrary explanation for his presence near her home. In light of the foregoing, the court's decision does not contain unsupported findings or reflect a misapplication of the law.

## II

The defendant's next claim is that the court erroneously determined, on the basis of its findings of fact and interpretation of § 46b-15 (a), that the defendant had engaged in a pattern of threatening between 2010 until the time of trial in 2013. As discussed previously in this opinion, the court exercised its discretion in continuing the restraining order after concluding that the defendant engaged in stalking and a pattern of threatening. Section 46b-15 (a) affords relief to victims "who [have] been subjected to a continuous threat of present physical pain or physical injury, stalking *or* a pattern of threatening . . . ." (Emphasis added.) Thus, a correct determination that the defendant engaged in either type of conduct affords this court a sufficient ground on which to affirm the judgment of the trial court. Because we have concluded in part I of this opinion that the court correctly determined that the defendant subjected the plaintiff to stalking, we need not reach the merits of this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

* April 25, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The plaintiff did not defend this appeal with proper diligence in that she failed to timely file a brief that complied with the requirements set forth in Practice Book § 67-2. Accordingly, we will consider the appeal on the basis of the record, the defendant's brief, and the arguments advanced by the defendant at the time of oral argument before this court.

[2] The record does not reflect that the trial court created a signed memorandum of decision in compliance with Practice Book § 64-1 (a), or that the defendant took measures to perfect the record in accordance with Practice Book § 64-1 (b). The defective record does not hamper our ability to review the issues presented on appeal because we are able adequately to ascertain the basis of the court's decision from the trial transcript. See, e.g., *Bridgeport Fire Fighters Local 998* v. *Bridgeport*, 106 Conn. App. 92, 93 n.1, 940 A.2d 868 (2008).

[3] Section 46b-15 is part of title 46b, "Family Law," and Chapter 815a, "Family Matters," and, as such, is specifically included as a court proceeding in a family relations matter. See General Statutes § 46b-1 (5).

[4] General Statutes § 46b-38a (2) defines a " '[f]amily or household member' " to include "[s]pouses or former spouses . . . ."

[5] For example, in subsection (a) of § 46b-15, the legislature explicitly incorporated the meaning of "pattern of threatening" as set forth in the Penal Code, specifically, General Statutes § 53a-62.

[6] General Statutes § 53-181d, which criminalizes stalking in the second degree, provides in relevant part: "(a) For purposes of this section, 'course of conduct' means two or more acts, including, but not limited to, acts in

which a person directly, indirectly or through a third party, by any action, method, device or means, (1) follows, lies in wait for, monitors, observes, surveils, threatens, harasses, communicates with or sends unwanted gifts to, a person, or (2) interferes with a person's property.

"(b) A person is guilty of stalking in the second degree when:

"(1) Such person knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for such person's physical safety or the physical safety of a third person; or

"(2) Such person intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person that would cause a reasonable person to fear that such person's employment, business or career is threatened, where (A) such conduct consists of the actor telephoning to, appearing at or initiating communication or contact at such other person's place of employment or business, provided the actor was previously and clearly informed to cease such conduct, and (B) such conduct does not consist of constitutionally protected activity."

[7] General Statutes § 53a-181e (a) provides: "A person is guilty of stalking in the third degree when he recklessly causes another person to reasonably fear for his physical safety by wilfully and repeatedly following or lying in wait for such other person."

———————————————————