******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE S. G. ET AL.*
## (AC 47745)

Seeley, Westbrook and Palmer, Js.

### *Syllabus*

The respondent mother appealed from the trial court's judgments rendered for the petitioner, the Commissioner of Children and Families, terminating her parental rights with respect to her minor children. The mother claimed, inter alia, that the court improperly determined that she had failed to achieve a sufficient degree of personal rehabilitation within the meaning of the statute (§ 17a-112 (j) (3) (B) (i)). *Held*:

The trial court's determination that the respondent mother failed to achieve the degree of personal rehabilitation required by § 17a-112 (j) (3) (B) (i) was supported by sufficient evidence in the record.

The trial court's finding that the termination of the respondent mother's parental rights was in the best interests of the children was not clearly erroneous, as there was sufficient evidence in the record to support that determination, even given the existence of a bond between the mother and the children.

Argued November 12—officially released December 24, 2024**

### *Procedural History*

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Litchfield, Juvenile Matters, and transferred to the judicial district of New London, Juvenile Matters at Waterford, where the cases were tried to the court, *Hoffman, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed to this court. *Affirmed.*

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the court.

** December 24, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*David B. Rozwaski*, assigned counsel, for the appellant (respondent mother).

*Monica O'Connell*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Nisa Khan*, assistant attorney general, for the appellee (petitioner).

*Opinion*

SEELEY, J. The respondent mother,[1] Elizabeth G., appeals from the judgments of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families (commissioner), terminating her parental rights with respect to her minor children, M and S (collectively, children). On appeal, the respondent claims that the court erred when it determined that (1) she had failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) (i), and (2) termination of her parental rights was in the children's best interests.[2] We disagree and, accordingly, affirm the judgments of the court.

The following relevant facts, which the court found by clear and convincing evidence, and procedural history are relevant to this appeal. M was born in May, 2017, and S in August, 2019. The respondent and the children's father, Christopher G. (father), "have been involved with [the Department of Children and Families

---

[1] Christopher G., the father of the minor children, is not involved in this appeal. The trial court found that Christopher G. "had not sufficiently rehabilitated . . . to the extent [he] could assume a responsible position in [the children's] lives in view of their ages and needs, or within a reasonable period of time thereafter" and that "termination of [his] parental rights" is in the best interests of the children. Accordingly, the court terminated his parental rights as to both children. He has not appealed from that judgment. Our references in this opinion to the respondent are to the mother only.

[2] The attorney for the minor children filed a statement adopting the brief filed by the commissioner.

(department)] since 2019. The first [report to the department] was made on August 26, 2019, following the birth of [S] . . . . It was noted [that the respondent] illicitly used Percocet and codeine and [that, after S was born, the child] spent nine days in [the neonatal intensive care unit] with withdrawal symptoms." S was born prematurely and addicted to opioids, which was found to correlate with the respondent's substance use during her pregnancy. The department's investigation revealed that the father was aware of the respondent's substance use during her pregnancy. Thereafter, the commissioner filed neglect petitions on October 3, 2019, and the children were placed under an order of protective supervision from February 5, 2020, until September 2, 2020.

"The second [report to the department] was made . . . on October 27, 2020, [when it] received a Careline[3] report from the Root Center [for Advanced Recovery (Root Center)] after [the respondent] self disclosed [that] she was actively using fentanyl at night while the children were sleeping." (Footnote added.) A third report to the department was made by the Winchester Police Department (police department) on January 17, 2021, after the respondent and the father "were found disoriented in the home" on January 14, 2021, when police officers had gone to the family's home in response to a call for medical assistance that the respondent had placed regarding the father. Upon arriving at the home, the police found the father in a disoriented state, and the respondent "told the police that the father had done 'a bag of stuff in the bedroom.' " The father was hospitalized with a suspected overdose and, the next day, the respondent turned a bag of fentanyl over to the police, stating that she believed it was what the

---

[3] "Careline is a department telephone service that mandatory reporters and others may call to report suspected child abuse or neglect." (Internal quotation marks omitted.) *In re Niya B.*, 223 Conn. App. 471, 478 n.7, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

father had ingested the day before. Two days later, the respondent "reported to [the police department that] the father was at the hospital for a couple of hours and there were high levels of arsenic in his system." That same day, she also turned additional bags of a powdery substance over to the police department. The father admitted to the respondent that he had used heroin on January 14, 2021, and the police reported that the children were in the home on that day, at the time the father was suspected to have overdosed.[4] This resulted in the department entering into a safety plan with the respondent and the father on January 19, 2021, which required that the father not be left unsupervised with the children and that the respondent supervise all contact between the children and the father pending the fulfillment of certain releases of records from her treatment providers to the department.

Shortly afterward, on February 2, 2021, the department was notified by the police that, on January 27, 2021, the police department had "received two separate calls [regarding] the family. The first call was from the father, who indicated [that] there was a dispute with the [family's] landlord over rent due, and [the] second call was from a concerned citizen [reporting] that [the respondent] was asleep in a car in [the] parking lot of [a] laundromat and [was later] seen driving erratically. The police arrived at the home, and the father was [found] alone with the children in violation of the safety plan." Thereafter, on February 3, 2021, the commissioner filed neglect petitions and sought orders of temporary custody, all of which were granted by the court. Also on February 3, 2021, the court ordered preliminary specific steps for the respondent to facilitate her reunion with the children.[5]

---

[4] Toxicology screening of the father indicated that there was no arsenic present in the father's system on January 14, 2021, but that he tested positive for fentanyl and heroin on that day.

[5] The preliminary specific steps required the respondent, inter alia, to keep all appointments set by or with the department; to cooperate with the

On July 14, 2021, the court adjudicated the children neglected, committed them to the care and custody of the commissioner, and ordered final specific steps for the respondent.[6] Approximately one year later, on July 29, 2022, the commissioner filed petitions to terminate the parental rights of both the respondent and the father as to each child. With respect to the respondent, the termination petitions alleged, inter alia, that, pursuant to § 17a-112 (j) (3) (B) (i), the children previously had been adjudicated neglected and the respondent had failed to achieve a degree of personal rehabilitation as would encourage the belief that, within a reasonable period of time, given the ages and needs of the children, she could assume a responsible position in their lives.

The termination of parental rights trial concerning both petitions was held on July 17 and 21 and December 4, 2023, and March 14, 2024. During the trial, counsel for

department's home visits; to let the department know where she and the children are at all times; to take part in counseling and make progress toward both parenting and individual treatment goals; to submit to a substance abuse evaluation and follow the recommendations about treatment, including inpatient treatment if necessary, aftercare and relapse prevention; to submit to random drug testing; not to use illegal drugs or abuse alcohol or medicine; to cooperate with service providers recommended for counseling, in home support services, and substance abuse assessment and treatment; to cooperate with court-ordered evaluations or testing; to sign, within thirty days, releases allowing the department to communicate with service providers to check on her attendance, cooperation, and progress toward identified goals, and for use in future court proceedings; to get and/or maintain adequate housing and a legal income; immediately to let the department know about any changes in the makeup of the household; to get and/or cooperate with a restraining/protective order and/or other appropriate safety plan to avoid more domestic violence incidents; not to get involved with the criminal justice system; to cooperate with the children's therapy; to visit the children as often as the department permits and demonstrate appropriate parent/ child interactions during visits; to inform the department, within thirty days, of information concerning any person whom she would like the department to consider as a placement resource for the children; and to tell the department the names and addresses of the children's grandparents.

[6] The final specific steps were identical to the preliminary specific steps. See footnote 5 of this opinion.

the commissioner presented testimony from Shannon Hedden, a clinician at Healing Hoofbeats who had worked with the children; Kelly McGinley-Hurley, a department services coordinator assigned to the case; Larissa Turner, a department social worker assigned to the case; Stephen Humphrey, an expert in clinical and forensic psychology who had completed a court-ordered evaluation of the respondent, the father and the children; and Sarah Laisi Lavoie, a visitation supervisor at Connecticut Family Support Services who had supervised visitation sessions between the respondent, the father and the children.[7] The father did not testify, and his counsel presented testimony from Araly Espinal, a visitation coach at Quality Parenting Center who had worked with the family, and the father's mother. The respondent did not testify or present testimony from any witnesses.

At trial, the evidence presented detailed the respondent's history of substance use, her unstable housing and employment, the children's needs, and the respondent's relationship with the children and can be summarized as follows. Regarding the children's needs and their relationship with the respondent, Hedden testified that the children referred to the respondent as "Liz," that the children's foster parents are attentive to their emotional needs, that "[the children] struggle with knowing what attachment is," and that "the foster parents are giving them a structured place where they can feel like a child and start to kind of develop into their own individual personalities without having to feel like it's going to get pulled away from them again." Hedden further testified that the children "need that stability and structure [a]nd . . . the foster parents can provide that for them."

---

[7] Turner also was called as a witness by the attorney for the minor children, who did not present testimony from any other witnesses.

Laisi Lavoie testified that the children were happy to see the respondent during most visits and had a "playful" relationship with her but that there were frequent concerns about the respondent's ability to comply with the rules for visits, such as those requiring the respondent not to whisper or give candy to the children. Similarly, Espinal testified that the respondent never missed a visit, that the children were happy to see the respondent at visits, that the respondent came prepared for the visits and that the respondent kept the children fully engaged at visits; however, she also indicated that the respondent had issues complying with program rules. For example, Espinal stated that during one visit, the respondent applied makeup to M and removed an eyepatch that S was wearing, despite being instructed not to do so.

As to the respondent's substance use history, McGinley-Hurley testified that the respondent has a "history of misuse of opiates and fentanyl dat[ing] back to her [being] an early teenager," that she had observed "a pattern of inconsistent treatment engagement with . . . respect to [the respondent]," and that the respondent was "actively testing positive for illicit substances . . . from March of 2022 . . . through the end of March, 2023, at the Root Center." With respect to visits with the children, she testified that the respondent brought items from her home despite being given instructions to the contrary because of the risk that the items might be contaminated with fentanyl. She also testified that confronting the respondent about this "would lead to a verbally aggressive outburst" by the respondent.

Turner testified that the respondent had been subject to two evictions, refused a hair test in April, 2023, was not employed, and had rescinded "any active releases . . . that would allow [the department] to reach out to [the respondent's] service providers." Lastly, Humphrey testified that he diagnosed the respondent with "opiate

use disorder, severe" based on her "chronic use of substances . . . over several decades," and, if not for those issues, "there likely would not be [a] substantial child protection concern." In his court-ordered psychological evaluation, which was admitted into evidence, Humphrey explained that, although the respondent has a positive relationship with her children and, if clean and sober, she would have the capacity to understand and meet the children's needs, given the severity of her substance use problems, the children should remain in foster care. He concluded in his report that before reunification could take place, the respondent would have to, inter alia, "remain engaged in outpatient substance abuse treatment [and] continue to test negative for illicit substances or unprescribed medications," both of which she has failed to do.

On April 22, 2024, the court issued a memorandum of decision in which it terminated the respondent's and the father's parental rights with respect to the children.[8]

---

[8] We note that " '[p]roceedings to terminate parental rights are governed by § 17a-112. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun.' . . . Section 17a-112 (j) provides in relevant part that '[t]he Superior Court, upon notice and hearing . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that (1) the [d]epartment . . . has made reasonable efforts to locate the parent and to reunify the child with the parent in accordance with subsection (a) of section 17a-111b, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, except that such finding is not required if the court has determined at a hearing pursuant to section 17a-111b, or determines at trial on the petition, that such efforts are not required, (2) termination is in the best interest of the child, and (3) . . . (B) the child (i) has been found by the Superior Court . . . to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .' " (Citation omitted.) *In re Niya B.*, 223 Conn. App. 471, 487–88, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

After setting forth the procedural history and making the relevant jurisdictional findings, the court stated that it "ha[d] carefully considered the termination of parental rights petitions, the criteria set forth in the relevant General Statutes, the applicable case law, as well as all the evidence and testimony presented, the demeanor and credibility of the witnesses, the evidence, and the arguments of counsel according to the standards of law." In addition, the court took "judicial notice of the entire record of the prior nondelinquency proceedings, including pleadings, petitions, social studies, status reports, evaluations, court memoranda and specific steps, as well as the dates and contents of the court's findings, orders, ruling and judgments." The court made its findings regarding the petitions for termination of parental rights "by clear and convincing evidence." Specifically, the court found by clear and convincing evidence that (1) the department had made reasonable efforts to locate the respondent and to reunify the respondent with her children and, further, that the respondent was unable and unwilling to benefit from the reunification efforts, (2) the commissioner established that a statutory ground for termination exists, namely, that the respondent had failed to achieve a sufficient level of personal rehabilitation as required by § 17a-112 (j) (3), and (3) termination of the respondent's parental rights was in the best interests of the children. This appeal followed.

"Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Internal quotation marks omitted.) Id., 476 n.5.

In this appeal, the respondent challenges the court's finding concerning the statutory ground of failure to rehabilitate within the meaning of § 17a-112 (j) (3) and its best interests finding. We now address each claim in turn.[9]

I

The respondent first claims that, during the adjudicatory phase, the court improperly determined that she

[9] Even though the respondent's appellate brief contains those two issues in the statement of issues and is organized as addressing those two issues only, in her brief she makes several references to the efforts the department made at reunification while arguing that the court erred in finding that she failed to rehabilitate. To the extent that those references as well as certain statements by the respondent's counsel at oral argument before this court can be construed as a challenge to the court's finding that the department made reasonable efforts to reunify the respondent with the children, we conclude that such a claim is inadequately briefed and, therefore, decline to review it. See *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016) ("Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Citation omitted; internal quotation marks omitted.)). Moreover, even if this court were to review the claim, it would dismiss it as moot because the respondent failed to challenge the court's determination that she was unable or unwilling to benefit from the department's reunification efforts. See *In re Autumn O.*, 218 Conn. App. 424, 432–33, 292 A.3d 66 ("[T]he department must prove either that it has made reasonable efforts to reunify or, alternatively, that the parent is unwilling or unable to benefit from reunification efforts. . . . Because either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1) . . . in cases in which the trial court concludes that both findings have been proven, a respondent on appeal must demonstrate that both determinations are improper. If the respondent fails to challenge either one of those independent alternative bases . . . the trial court's ultimate determination that the requirements of § 17a-112 (j) (1) were satisfied remains unchallenged and intact. . . . In such instances, the appeal is moot, as resolution of a respondent's claim of error in her favor could not [afford] her any practical relief." (Emphasis omitted; internal quotation marks omitted.)), cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023); see also *In re A'vion A.*, 217 Conn. App. 330, 353–58, 288 A.3d 231 (2023) (dismissing as moot portion of appeal challenging court's finding that department made reasonable efforts to reunify respondent with children when respondent did not also challenge court's alternative finding that respondent was unable or unwilling to benefit

had failed to achieve a sufficient degree of personal rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i). Specifically, the respondent argues that the court erred in reaching this determination because she "has continued to try and address her substance abuse issues [and] [w]hile . . . still engaged in addressing those issues, she has consistently maintained her visitation and her relationship with her children and has demonstrated the ability during visits to engage in appropriate activities and boundary setting and, more importantly, [has] demonstrat[ed] love and affection for her children." We are not persuaded.

The following additional facts and procedural history are relevant to our resolution of this claim. The respondent reported that she started to abuse pain medication around the time she was in the twelfth grade, that her "drug of choice" was pills, which later led to her use of heroin, and that she has been addicted to narcotics since she was eighteen. A toxicology screen of the respondent revealed that, on January 14, 2021, the date that the father overdosed while at home with the children, she tested positive for cocaine and fentanyl. Between the date that the children were removed from the respondent's custody—February 3, 2021—to the date that the court rendered its judgments terminating her parental rights—April 22, 2024—the department referred the respondent to a number of services, including for parenting, substance abuse and mental health treatment.

In its memorandum of decision, the court summarized the respondent's engagement with the services referred to her, stating: "[The respondent] did not engage in mental health treatment from the onset of

from reunification efforts, as "either finding, standing alone, provides an independent basis for satisfying § 17a-112 (j) (1)" (internal quotation marks omitted)).

this case until July 8, 2021. [The respondent] attended mental health treatment at Tides of Mind [Counseling] from July 8, 2021, until September 30, 2021. [The respondent] discontinued treatment with Tides of Mind [Counseling] upon entry into inpatient treatment. [The respondent] has not engaged in mental health treatment since September, 2021. [The respondent] reported to [the department] that she was in therapy at the Connecticut Counseling Center, but [the department] could not confirm due to [the respondent's] failure to sign releases of information.

"As to substance abuse treatment, [the respondent] was engaged with the Root Center from the onset of this case until April, 2021, [when the respondent] self discharged . . . and it was recommended [that] she engage in outpatient services. [The respondent] reportedly attended an intake with Lisa Haut, however, information from that appointment was not available because [the respondent] did not sign a release of information. [The respondent] self-reported [that] she did not engage in any services with [Haut]. As a result of the lack of toxicology screens and continued concerns regarding parental insight into her substance abuse, the department facilitated a Regional Resource Group Consultation on September 20, 2021. On September 27, 2021, a referral was made to Screening and Brief Intervention Referral to Treatment (SBIRT). [The respondent] did not cooperate with the referral. As a result of [the respondent's] noncompliance to submit to [toxicology] screens it was recommended that [she] submit to a hair test. [The respondent] did not comply with the request. On October 20, 2021, [the respondent] was admitted [as an] inpatient at the Stonington Institute [but] . . . was [discharged] on October 24, 2021. In November, [2021], the department recommended [that the respondent] reengage in substance abuse treatment

and begin an [intensive outpatient program] at [the Midwestern Connecticut Council of Alcoholism]. [The respondent] did not comply. [The respondent] said she engaged in [an intensive outpatient program], but the department was unable to verify this because [the respondent] did not sign a release of information. In March of 2022, [the respondent] indicated [that] she reengaged in [services at the Root Center] but revoked her releases on June 17, 2022. [The respondent] then reinstated her releases and her last [toxicology] screen on July 5, 2022, tested positive for fentanyl and opiates. The department met with [Root Center staff] on July 15, 2022, and, on August 19, 2022, it was reported [that the respondent's] attendance had been consistent and she had not missed any medication dates; however, [the respondent] continued to test positive for opiates and fentanyl.

"[The respondent] . . . submitted to the court-ordered evaluation with [Humphrey] on March 22 and 29, 2022. [Humphrey] opined that the primary child protection concern was [the respondent's] . . . opioid use disorder but [that] there was potential for rehabilitation in a time frame conducive to reunification. As a result of the evaluation, it was recommended [that the respondent] . . . comply with a hair test every ninety days, engage in treatment for six months, demonstrate abstinence from substances, regularly visit with the children and refrain from acts that would form the basis for an arrest, [so] then efforts for reunification might begin. [The respondent] was referred for a hair test on July 19, 2022, [however, she] did not submit to the test until July 26, 2022. The hair test reflected a positive result for fentanyl. [The respondent] did not comply with any subsequent requests for a hair test.

"The Root Center's September, 2022 report noted that [the respondent] was unsuccessfully discharged from intensive outpatient treatment on August 11, 2022, as

[she] discontinued treatment on her own. [The respondent's] [toxicology] screen [from] August 8, 2022, tested positive for opiates and fentanyl and her [toxicology] screen [from] September 1, 2022, was positive for fentanyl and norfentanyl. The Root Center's October, 2022 report noted [that the respondent] again restricted her releases and . . . [that she] was discharged . . . [because she] discontinued treatment. [The respondent] was [again referred] for [an intensive outpatient program] on September 29, 2022; however, she did not reengage. The department had trouble obtaining updates in November and December, 2022, due to the lack of releases signed by [the respondent].

"In January, 2023, it was reported [that the respondent] had been [taking a daily dose of] methadone but [a urine sample collected from her on November 4, 2022], tested positive for marijuana, opiates, fentanyl and heroin. [The respondent] attended an intake for [an intensive outpatient program] on December 27, 2022, but did not attend any sessions. The February, [2023] update from the Root [Center] indicated [that the respondent had been] unsuccessfully discharged for lack of attendance. [A urine sample collected from the respondent] on January 25, 2023, was positive for fentanyl and heroin. In June, 2023, the department attempted to get an update from the Root Center and was informed [that the respondent had] revoked her release [earlier in the month] and was no longer engaged with the Root Center. It was later learned that [the respondent] had been unsuccessfully discharged from intensive outpatient treatment at the Root Center in January, 2023. [The respondent] did not reengage in the recommended treatment. In March, 2023, [a urine sample collected from the respondent] tested positive for methadone and norfentanyl. [The respondent's toxicology] screens [from] April and May, [2023], were positive for methadone only. On June 29, 2023, the father

informed [the department] that he and [the respondent] stop[ped] engaging [with] the Root Center in June, 2023, and . . . stated: '[The respondent and I] took the next step in [our] sobriety and shed the medication crutch.'

"[The respondent] . . . [has] not [been] referred to the . . . Family Time Program since June of 2021 due to [her] lack of progress in services and [her] active substance use. [The respondent] . . . [was] referred to parenting services and supervised visitation [at the] Quality Parenting Center on February 9, 2023. It is noted [that the respondent] . . . [came] prepared for the visits; however, there [were] concerns with [the respondent's] . . . ability to adhere to the [program's] rules and expectations. Of note is that on March 20, 2023, [the respondent] was asked several times not to remove [S's] eyepatch, which [he] is required to wear, but [the respondent] continued to remove it. During another visit that took place with [the Quality Parenting Center] on June 22, 2023, it was reported [that the respondent] presented as 'rude' throughout the visit . . . [Quality Parenting Center staff] observed many cuts and bruises on [her] hands, and the visit ended early because [the respondent] did not feel well. As of July 6, 2023, [the respondent] had outstanding criminal charges for [two separate counts of larceny in the sixth degree, one count of larceny in the third degree, and one count of] stealing a firearm."

In adjudicating whether the respondent had failed to achieve sufficient rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i), the court set forth the relevant legal standard and then summarized the results of the respondent's efforts to rehabilitate, stating: "[The respondent] has a history with [the department] dating back to 2019. [The respondent] has a long history of substance abuse dating back to her early teenage years. . . .

"As to personal rehabilitation, as noted in detail above, [the respondent] has failed to participate or make progress in any [of the] recommended services. Despite multiple referrals and attempts to engage [the respondent] in treatment, to address her substance use, mental health, and parenting, she has not followed through with recommended services. [The respondent] has continued to show limited insight into her children's needs. . . .

"There is no better example of the unfortunate consequences of [the respondent's] failure to stay sober than her failure to comply with the recommendations of the court-ordered psychological evaluation. The evaluation indicated that if [the respondent] was able to demonstrate [that] she had remained drug free and was attending substance abuse treatment for a period [of] six months, reunification would be a viable option. . . . [The respondent] continues to show little insight into how her substance abuse impacts her ability to provide a safe and stable environment for her children. . . . As to parenting, it appears [the respondent] . . . [has] engaged in parenting services and [has] regularly attended the scheduled visitation. [However, concerns remain] that [the respondent] . . . continue[s] to have limited insight into the problems that led to the removal of the children. . . .

"[The respondent] . . . [is] unable to parent [the children] and serve as their [caretaker]. [She] [is] unable to meet the developmental, emotional, educational and medical and moral needs of [the] children. [She] cannot provide for the shelter, nurturance, safety and security of the children. . . . [The respondent does not have] stability in [her] own [life] to enable [her] to care for [the children]. . . . [The respondent] has [not] made significant progress toward personal rehabilitation and clearly cannot assume a responsible position in [the children's] lives considering their ages and needs."

(Citation omitted.) Thus, the court found that the "evidence clearly and convincingly establishes" that the commissioner "met [her] burden of proof [of establishing] that [the respondent] . . . [has] failed to rehabilitate in that, given the ages and needs of [the children] [she] cannot assume a responsible position in [the children's lives] within a reasonable period of time [as] [she] continue[s] to fail to demonstrate the ability to rehabilitate despite being offered ongoing services."

In making this finding, the court emphasized that its "paramount consideration . . . is the issue of stability and permanency for [the children]. . . . [The children's] need for permanence far outweighs any remote chance that [the respondent] . . . may rehabilitate in the far distant future. . . . [The children] cannot afford to wait for [the respondent] to rehabilitate. . . .

"[The department] has provided compelling evidence that [the children] need permanency and stability now.[10] . . . Thus, the evidence clearly and convincingly establishes that as of the end of the trial of this matter, [the respondent] . . . had not sufficiently rehabilitated [herself] to the extent [she] could assume a responsible position in [the children's] lives in view of their ages and needs, or within a reasonable period of time thereafter." (Citation omitted; footnote added.)

We next set forth the relevant standard of review and legal principles. "Failure to achieve a sufficient degree

---

[10] In addition to the previously discussed testimony of Hedden on this subject, social studies conducted by the department were also admitted into evidence. In an addendum to one of those social studies, dated June 29, 2023, the social worker concluded that "[the respondent was] unable to provide a safe, nurturing home environment free of substance use for [the] . . . children," that "[M] and [S] are in need of a permanent and stable living arrangement in order to grow and develop in a healthy manner," and that, after approximately two years in the commissioner's custody, "[t]o allow additional time for [the respondent] to rehabilitate is contrary to the best interests of the children and their need for permanency."

of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j) (3). Section 17a-112 (j) permits a court to grant a petition to terminate parental rights 'if it finds by clear and convincing evidence that . . . (3) . . . (B) the child [(i)] has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .' " *In re A'vion A.*, 217 Conn. App. 330, 347, 288 A.3d 231 (2023).

"The trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when [he or she] will be able to assume a responsible position in [his or her] child's life. Nor does it require [him or her] to prove that [he or she] will be able to assume full responsibility for [his or her] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he or she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he or she] can assume a responsible position in [his or her] child's life. . . . Personal rehabilitation as used in [§ 17a-112 (j) (3) (B) (i)] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [his or her] ability to manage [his or her] own life, but

rather whether [he or she] has gained the ability to care for the particular needs of the child at issue. . . .

"During the adjudicatory phase of a termination proceeding, a court generally is limited to considering only evidence that occurred before the date of the filing of the petition or the latest amendment to the petition, often referred to as the adjudicatory date. . . . Nevertheless, it may rely on events occurring after the [adjudicatory] date . . . [in] considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time. . . .

"A conclusion of failure to rehabilitate is drawn from both the trial court's factual findings and from its weighing of the facts in assessing whether those findings satisfy the failure to rehabilitate ground set forth in § 17a-112 (j) (3) (B). Accordingly . . . the appropriate standard of review is one of evidentiary sufficiency, that is, whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . We will not disturb the court's subordinate factual findings unless they are clearly erroneous. . . . Thus, [i]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Citations omitted; footnote omitted; internal quotation marks omitted.) *In re*

*Niya B.*, 223 Conn. App. 471, 488–90, 308 A.3d 604, cert. denied, 348 Conn. 958, 310 A.3d 960 (2024).

In the present case, the respondent has not challenged the court's subordinate factual findings as being clearly erroneous. Instead, she points to the evidence of her interactions with her children and argues that it "undermines confidence in the trial court's conclusions and decision." Because the respondent has not challenged any of the court's factual findings in support of its determination that she had failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B), we limit our review to whether the record contains sufficient evidence from which the trial court reasonably could have concluded, upon the facts established and the reasonable inferences drawn therefrom, that the respondent failed to rehabilitate. See *In re Autumn O.*, 218 Conn. App. 424, 434, 292 A.3d 66 ("[w]e review the trial court's subordinate factual findings for clear error, and review its finding that the respondent failed to rehabilitate for evidentiary sufficiency" (internal quotation marks omitted)), cert. denied, 346 Conn. 1025, 294 A.3d 1026 (2023).

Moreover, "[i]t is well established that a respondent's failure to acknowledge the underlying personal issues that form the basis for the department's concerns indicates a failure to achieve a sufficient degree of personal rehabilitation. See *In re Kamora W.*, 132 Conn. App. 179, 190, 31 A.3d 398 (2011) (respondent refused to acknowledge drug or alcohol problem); *In re Jocquyce C.*, 124 Conn. App. 619, 626–27, 5 A.3d 575 (2010) (respondent failed to acknowledge habitual involvement with domestic violence); *In re Christopher B.*, 117 Conn. App. 773, 784, 980 A.2d 961 (2009) (respondent blamed others for problems); *In re Jermaine S.*, 86 Conn. App. 819, 834, 863 A.2d 720 (respondent's inability to admit she had substance abuse problem thwarted her ability to achieve rehabilitation), cert. denied, 273

Conn. 938, 875 A.2d 43 (2005); *In re Sheila J.*, 62 Conn. App. 470, 481, 771 A.2d 244 (2001) (respondent failed to recognize her need for recommended counseling). . . . [A]s a general proposition, the failure to acknowledge and make progress in addressing the issues that led to a child's removal may be one of many contributing factors to a court's determination that a parent has failed to achieve a sufficient degree of personal rehabilitation." (Citation omitted; internal quotation marks omitted.) *In re Niya B.*, supra, 223 Conn. App. 491–92; see also *In re Nevaeh G.-M.*, 217 Conn. App. 854, 877, 290 A.3d 867 ("[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department" (internal quotation marks omitted)), cert. denied, 346 Conn. 925, 295 A.3d 418 (2023); *In re Janazia S.*, 112 Conn. App. 69, 95, 961 A.2d 1036 (2009) ("[a]lthough the standard is not full rehabilitation, the parent must show more than *any* rehabilitation" (emphasis in original; internal quotation marks omitted)).

"Construing the record before us in the manner most favorable to sustaining the judgment of the trial court, as we are obligated to do"; *In re Anthony S.*, 218 Conn. App. 127, 148, 290 A.3d 901 (2023); we conclude that there is sufficient evidence in the record to support the court's finding that the respondent had failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that, considering the ages and needs of the children, she could assume a responsible position in their lives within a reasonable time. The overwhelming evidence that was before the court establishes that the respondent is a longtime and active user of fentanyl, heroin and opiates. The evidence also shows

that the respondent's struggles with substance use, particularly fentanyl and heroin, and her lack of insight in understanding how her continued substance use has negatively impacted the well-being and safety of the children were the primary concerns of the department throughout its involvement with the respondent. In particular, the evidence clearly established that, despite the department's efforts to assist the respondent with addressing her substance use, she remained an active user of fentanyl and heroin from the time that the children were placed in the commissioner's custody in February, 2021, to the time of trial.[11] The respondent's failure to acknowledge or correct her problem with substance use is also demonstrated through her documented refusal to consistently submit to toxicology screening[12] or to sign releases relating to her substance abuse treatment, which continued into 2023.[13] Indeed, the respondent's noncompliance in this regard was as frequent as her positive toxicology results.

The court also found that, due to the children's need for permanence and stability, "[the children] cannot afford to wait for [the respondent] to rehabilitate." See *In re Amneris P.*, 66 Conn. App. 377, 385, 784 A.2d 457 (2001) (affirming trial court's determination that

[11] The respondent tested positive for fentanyl and heroin at various times in 2021. In 2022, the respondent tested positive for fentanyl and opiates in July, fentanyl in August and September, and fentanyl and opiates in November. The respondent's substance use continued into 2023, as she tested positive for fentanyl in January and March of 2023.

[12] For instance, the respondent refused to submit to a hair test on May 18, 2023, and the department was unable to obtain the results of the respondent's toxicology screens as recently as June, 2023, the month prior to the commencement of the termination trial.

[13] Similarly, given the respondent's recent evictions—two months before the termination trial, the respondent was in the process of being evicted from her home, after having previously been evicted from her prior home— the court could have reasonably inferred that the respondent failed to acknowledge her lack of parental insight into how her substance use impacted her ability to provide the children with a stable home.

respondent failed to rehabilitate because, "[a]lthough the respondent may have achieved a level of stability within her limitations, the court had more than sufficient evidence to support a finding that her personal gains were not made in a timely way so as to assist her child" and, therefore, "[t]he court's finding that the child should not be further burdened by having to wait for her mother to achieve the level of competency necessary to parent her was fully supported by the evidence"). An addendum to one of the social studies admitted into evidence indicates that "[the respondent has] limited insight into [the] children's current development, needs, and age appropriate behaviors." Although the respondent asserts in her appellate brief that "the law 'sets no particular time' " as to when she must be able to assume a responsible position in her children's lives, the evidence concerning the children's need for permanency and stability supports the court's determination that she would not be able to do so within a reasonable time, given the ages and needs of the children and given her failure to acknowledge and make progress in addressing the issues that led to the removal of the children.

In summary, the totality of the evidence sufficiently establishes that the factors that led to the children's initial commitment—the respondent's substance use and her lack of insight—have not been corrected or even properly acknowledged by the respondent and that the children's need for permanence and stability outweighed the potential that the respondent may rehabilitate at some undefined point in the future. Accordingly, we conclude that the evidence, when construed in the manner most favorable to sustaining the court's judgments, is sufficient to support the court's determination that the respondent failed to achieve such a degree of personal rehabilitation as would encourage

the belief that, within a reasonable time, she could assume a responsible position in the children's lives.

## II

Next, the respondent claims that during the dispositional phase, the court erred in determining that the termination of her parental rights was in the children's best interests. Specifically, the respondent argues that "[t]he evidence clearly demonstrated that the [respondent] expresses love and affection for [the] children, is concerned for [the] children's health and well-being, provides food and activities for the children during the visits, and, while the children are not able to live with her, the [respondent] during visits with the children . . . engage[s] [them] in creative and meaningful activities, provide[s] structure and redirection when needed, and demonstrate[s] appropriate love and affection toward the children." She further argues that "[t]here has not been any evidence that would address the impact and consequences of the children never being able to see the [respondent] again" and that she and the father "have been the one constant in the children's lives [and] have been nurturing and giving to [the] children to the best of their abilities and circumstances." Conversely, the commissioner argues that the respondent's "affection for her children is not enough to find clear error in the . . . court's best interest[s] determination," which "is not clearly erroneous because there is sufficient evidence in the record to support it." We agree with the commissioner.

The following additional facts and procedural history are relevant to our resolution of this claim. The children have been in foster care since they were removed from the respondent's custody, and, at the time the court rendered its decision, the children were in their fourth foster placement. The first foster home requested the children's removal in August, 2021, due to a lack of a

specific time frame in which the children would be reunified. The children were subsequently placed in their second foster home; however, that home requested the children's removal after "receiving badgering emails and phone calls from the parents." The children were then placed in their third foster home, but, in December, 2022, those foster parents requested removal of the children after the foster parents received "verbally aggressive emails" from the respondent and the father, including one "acknowledg[ing] [that the respondent and the father knew] where the foster parents . . . lived." The foster parents also became aware that the respondent and the father had moved within four miles of the foster parents' home.[14] Thereafter, the children were placed in their fourth foster home, where they have since resided. At trial, Turner testified that the children's present foster home "is free of any safety concerns," that the children "are very bonded to the foster parents [whom they] refer to . . . as 'mom' and 'dad,' " and that the children "express that they are happy [and] . . . that they don't want to go anywhere else but live on the farm [where their foster home is located]."

In the portion of its memorandum of decision concerning disposition, the court made findings pursuant to § 17a-112 (k)[15] and then analyzed whether the termination of the respondent's parental rights was in the

[14] The court found that it was reported to the department that the respondent "was 'absolutely giddy' over the fact that the children were being disrupted from their [third foster placement]."

[15] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the [department] has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent

children's best interests, stating: "In determining
whether terminating [the respondent's] . . . parental
rights would be in the best interests of [the children]
the court has considered various factors as to each
child. The court must look at each child's interest in
sustained growth, develop[ment], well-being, and in the
continuity and stability of his or her environment . . .
the ages and needs of each child, the length and nature
of his or her stage of foster care, the contact and lack
thereof [between each child and the respondent], the
potential benefit or detriment of [the child] retaining a
connection with his or her biological [parent]; [the
child's] genetic bond with [the biological parent] . . .
and the seven statutory factors [in § 17a-112 (k)] and
the court's findings thereon.[16] The court has also bal-
anced each child's intrinsic need for stability and perma-
nence against the potential benefits of maintaining a
connection with [the respondent]. . . .

to which all parties have fulfilled their obligations under such order; (4) the
feelings and emotional ties of the child with respect to the child's parents,
any guardian of such child's person and any person who has exercised
physical care, custody or control of the child for at least one year and with
whom the child has developed significant emotional ties; (5) the age of the
child; (6) the efforts the parent has made to adjust such parent's circum-
stances, conduct, or conditions to make it in the best interest of the child
to return such child home in the foreseeable future, including, but not limited
to, (A) the extent to which the parent has maintained contact with the child
as part of an effort to reunite the child with the parent, provided the court
may give weight to incidental visitations, communications or contributions,
and (B) the maintenance of regular contact or communication with the
guardian or other custodian of the child; and (7) the extent to which a
parent has been prevented from maintaining a meaningful relationship with
the child by the unreasonable act or conduct of the other parent of the
child, or the unreasonable act of any other person or by the economic
circumstances of the parent."

[16] The court made the following written findings pursuant to § 17a-112 (k)
"by clear and convincing evidence" as to the respondent: (1) the respondent
was offered the services described previously in this opinion by the depart-
ment; (2) the department made reasonable efforts to reunify the respondent
with the children; (3) "[t]here continues to be concerns of ongoing substance
use and mental health concerns . . . [and the respondent] has not followed
through with any recommended services"; (4) "M . . . is emotionally

"The court finds that termination of [the respondent's] . . . parental rights is in the best interests of [the children]. The convincing and clear evidence has established that [the respondent] . . . [is] in no better position today to provide for [the children] than [she was] at the time of their removal. The problems that led to the [children's] removal have not been rectified and the prospects of improvement are bleak especially in light of [the respondent's] lack of progress [with] services to address her mental health, substance abuse and parenting . . . .

"[This] conclusion is supported by the testimony of the witnesses as well as the information contained in the exhibits presented at the . . . trial. [The children] desperately need the permanency and stability that they have in their foster home. Termination of parental rights will bring that much needed stability and permanency to them and an opportunity to have . . . healthy and

bonded to both [the respondent and the father and she] expresses excitement over her visitation with [them] and asks about her return to their care . . . [M] is also bonded with her . . . foster parents [as] [s]he looks to them for affection and appears comfortable in their care . . . [S] appears comfortable and bonded to [the respondent] and the father during his time with them, however, he does not display signs of distress upon separation . . . [S] is also bonded to his . . . foster parents [as] [h]e looks to them for affection and appears comfortable in their care"; (5) "S . . . is four years old [and] M . . . is six years old"; (6) the respondent has not "followed through with . . . services [recommended] . . . by the department . . . [t]here continues to be ongoing substance use and mental health concerns . . . [t]he department's efforts to make appropriate assessments are hindered by the lack of compliance with services and lack of compliance [with] signing releases of information, the [p]arents continue to use substances, have unaddressed mental health concerns and have engaged in criminal activity [and] [a]s a result, neither [of them] will be able [to] establish a caregiving role within a reasonable period of time given the children's needs and ages"; and (7) the respondent "has not been prevented from maintaining a meaningful relationship with her children by the conduct of the father or the unreasonable act of any other person or by her economic circumstances [as her] lack of engagement/progress in services to address her mental health, substance abuse and parenting have interfered with her ability to be the primary caretaker of her children."

emotionally stable [lives]. [The children's] needs are those of all children. They have an interest in sustained growth, development, well-being and a continuous, stable environment. Accordingly, based upon the clear and convincing evidence presented, the court finds that it is in [the children's] best interests to terminate the parental rights of [the respondent] . . . ."[17] (Citations omitted; footnote added.)

Our standard of review in a challenge to a trial court's best interest determination in a proceeding to terminate parental rights is well established. "[A]n appellate tribunal will not disturb a trial court's finding that termination of parental rights is in a child's best interest unless that finding is clearly erroneous.[18] . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling. . . . In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . In the dispositional phase . . . the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in . . . § 17a-112 [(k)].

---

[17] The court also noted that, "[a]t the conclusion of the trial, the attorney for the minor children requested that the court . . . terminate the parental rights of [the respondent] . . . as to [the children] as it was in [their] best interests . . . to do so."

[18] "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct." (Internal quotation marks omitted.) *In re Autumn O.,* supra, 218 Conn. App. 442 n.13.

. . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered." (Footnote in original; internal quotation marks omitted.) *In re Autumn O.*, supra, 218 Conn. App. 442. "Indeed . . . [t]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . [A] trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Internal quotation marks omitted.) *In re Aubrey K.*, 216 Conn. App. 632, 654–55, 285 A.3d 1153 (2022), cert. denied, 345 Conn. 972, 286 A.3d 907 (2023).

"Our appellate courts have recognized that long-term stability is critical to a child's future health and development . . . ." (Internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 767, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008). "In addition to considering the seven factors listed in § 17a-112 (k), [t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . Furthermore, in the dispositional stage, it is appropriate to consider the importance of permanency in children's lives. . . . The respondent's efforts to rehabilitate, although commendable, speak to [her] own conduct, not the best interests of the child. . . . [W]hatever progress a parent arguably has made toward rehabilitation is insufficient to reverse an otherwise factually supported best interest finding. . . . Additionally, although the respondent may love her children and share a bond with them, *the existence of a bond between a parent and a child, while relevant, is not dispositive of a best interest determination.*"

(Citations omitted; emphasis added; internal quotation marks omitted.) *In re Autumn O.*, supra, 218 Conn. App. 444. "Our courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006).

The essence of the respondent's argument is that the court's best interest determination is clearly erroneous because a strong bond exists between her and the children.[19] Our case law, however, treats the existence of such a bond as relevant to a court's best interest determination, but not dispositive. See *In re Autumn O.*, supra, 218 Conn. App. 444. Consequently, so long as there is sufficient evidence to support the court's reliance on other factors, its best interest determination is entitled to deference. See id., 443–45 (affirming best interest determination, which was challenged as clearly erroneous based on respondent's "strong relationship" with children, because "ample evidence in the record" supported "court's conclusion that it was in the best interests of the minor children to terminate the respondent's parental rights" due to children's need for "a safe home environment"). In the present case, the court expressly set forth the "various factors" that it considered when making its best interest determination. In particular, the court weighed "each child's interest in

---

[19] Aside from this central argument, the respondent also argues that the court's best interest determination was clearly erroneous because, "[a]lthough the trial court noted in its decision that . . . a loving relationship between a parent and child does not preclude termination of parental rights, when the court balances that bond against the children's need for permanency and stability . . . [t]he evidence in this case is that the . . . children have had at least four different placements in foster care." We reject this argument because, as previously discussed, it was the respondent's deliberate conduct in disrupting the children's foster placements that caused such instability.

sustained growth, development, well-being, and in the continuity and stability of his or her environment . . . the ages and needs of each child, the length and nature of his or her stage of foster care, the contact and lack thereof [between each child and the respondent], the potential benefit or detriment of [the child] retaining a connection with [the respondent], his or her genetic bond" with the respondent and its findings under § 17a-112 (k).

The court explicitly factored the existence of a bond between the respondent and the children into its best interest analysis. It ultimately determined, however, that, despite the existence of any such bond, the termination of the respondent's parental rights was necessary to provide the children with "much needed stability and permanency" and the "opportunity to have a healthy and emotionally stable life." There was sufficient evidence in the record to support that determination, as the evidence at trial established that, during the time that the respondent consistently demonstrated an inability to maintain her sobriety or to meaningfully engage with the services referred to her by the department, the children were "thriv[ing]" in their present foster placement, a home that "is free of any safety concerns" and where the children "are very bonded to the foster parents [whom] [t]hey refer to . . . as 'mom' and 'dad.' " In addition, such evidence established that this is the children's fourth foster placement, with their prior placements having been intentionally disrupted by the respondent's conduct, and the testimony provided by Hedden emphasized that the children "need . . . stability and structure" and that "the foster parents can provide that for them." The court's decision to assign the greatest weight in its best interest analysis to the children's need for permanence and stability cannot be considered clearly erroneous simply because a bond exists between the respondent and the children.

See *In re Rachel J.*, supra, 97 Conn. App. 761; see also *In re Anthony H.*, supra, 104 Conn. App. 763–68 (rejecting respondent's argument that because she has strong bond with children, and one child "had a number of different foster parents in the [time] he has been in the petitioner's custody," trial court's best interest determination was clearly erroneous, and concluding instead that "the court properly found that she has failed to undertake the rehabilitative steps outlined for her or to take advantage of the services provided to her in a timely manner so that she could be reunified with the children [and as] [t]he best interests of the children call for permanency").

We conclude that the court's finding, by clear and convincing evidence, that the termination of the respondent's parental rights is in the best interests of the children, even given the existence of a bond between the respondent and the children, is not clearly erroneous. Accordingly, in light of the evidence in the record before us, especially concerning the respondent's substance use, her failure to make any progress toward sobriety and the children's need for stability and permanency, we conclude that the court's finding that it is in the children's best interests to terminate the respondent's parental rights is factually supported and legally sound. We, therefore, will not substitute our judgment for that of the trial court.

The judgments are affirmed.

In this opinion the other judges concurred.